MINING COMPANY *v.* CONSOLIDATED MINING COMPANY.

1. The grant of the sixteenth and thirty-sixth sections of public land to the State of California for school purposes, made by the act of March 3, 1853 (10 Stat. 246), was not intended to cover mineral lands.   Such lands were, by the settled policy of the general government, excluded from all grants.

2. A settlement within the meaning of sect. 7 of that act is not required, either in regard to the acts to be done or the qualifications of the settler, to be precisely the same as that whereby a pre-emption right can be secured under the act of Sept. 4, 1841.   5 Stat. 453.

3. Whenever, at the time the government surveys of section 16 or 36 of public land in California are made, there is, by the erection of a dwelling-house or by cultivation, a settlement on any portion thereof, whereon some one resides who asserts claim thereto, the title to such portion does not vest in the State, but she has the right to other land in lieu thereof.  *Sherman* v. *Buick* (93 U. S. 209) and *Water & Mining Company* v. *Bugbey* (96 id. 165) commented on and explained.

ERROR to the Circuit Court of the United States for the District of California.

' The facts are stated in the opinion of the court.

*Mr. Peter Van Clief* and *Mr. Oliver D. Barrett* for the plaintiff in error; *Mr. Samuel M. Wilson* and *Mr. George A. Nourse* for the defendant in error; *Mr. Benjamin F. Butler* for the State of California; and *The Attorney-General* for the United States.

MR. JUSTICE MILLER delivered the opinion of the court.

The action in this case was brought originally in the State court of California by Daniel W. Gillette against the Keystone Consolidated Mining Company, the present defendant in error, to recover possession of the east half of section 36, in township 7 north, range 10 east of Mount Diablo meridian, and in the progress of the case it was transferred to the Circuit Court of

the United States, where judgment was rendered in favor of the defendant. The Ivanhoe Mining Company, the plaintiff in error, having been substituted for Gillette, as his successor in interest, a jury was waived by the parties, and the case submitted to the court.

The plaintiff asserted title to the land in controversy under a patent from the State of California, and the defendant under patents from the United States. The title of California rests upon the act of Congress granting that State the sixteenth and thirty-sixth sections of every township for school purposes, and that of defendant on the acts of Congress concerning the possession and sale of the mineral lands.

As the question to be decided necessarily involves the title to much other mineral land in California, in which the authorities of the State of California and the officers of the Land Department of the United States entertain and act upon conflicting views of the rights of the State and the general government, the State of California by her counsel, and the United States by the Attorney-General, have been permitted to take part in the argument.

The defendant only claims part of the land embraced in plaintiff's patent, and denies possession of that for which no title is asserted ; and, as no possession is proved beyond that for which the defendant defends, only that is in controversy.

The court below finds that this is mineral land, and that the patent of the United States was issued to defendant for three several mining claims; to wit, the Spring Hill, the Geneva, and the Keystone. That the Spring Hill was located in May, 1851, the Keystone in 1853, and the Geneva in October, 1863; and that the original locators of said claims and their grantees have held undisturbed possession thereof ever since, and by such possession and the working of said mines the possessory title was vested in defendant at the time it filed its application for said patent in the land-office of the United States at Sacramento, Jan. 6, 1871, unless the State of California had acquired title to section 36 by grant from the United States. It also appears that on the land thus claimed by plaintiff a mining town, called Amador City, exists, of about four hundred or five hundred people, which began in 1850, and reached the

number mentioned in 1853, with many dwelling-houses, and some forty acres cultivated by the owners of the Keystone mining claim.

On the 18th of June, 1870, one Henry Casey applied to the State authorities to purchase the half-section of land on which this town and these mining claims were located, and a State patent was issued to his vendee, Gillette, Oct. 3, 1872.

The township in which this land lies was surveyed in the field in March, 1870, the survey approved Sept. 3, 1870, and the plat filed in the United States land-office at Sacramento, Oct. 7, 1870. Within three months after this latter date the application of the defendant was made for patents for the three mining claims, and the patents were issued July 14, 1873.

The right to these patents, and the claim of the town of Amador City, were contested before the register and receiver, the Commissioner of the General Land-Office, and the Secretary of the Interior, by the State of California, and the parties claiming under her, and the decision was adverse to the title of the State.

The question, and the only question, presented for our consideration is very sharply presented by this statement of facts and by the acts of Congress pertinent to the subject; and it is, whether under these acts the title of the land in question became fixed and vested absolutely in the State of California on the ascertainment by the survey of 1870 that it was part of the thirty-sixth section of the township in which it lies.

The act of March 3, 1853 (10 Stat. 244), under which the right of the State of California to the school lands arises, has been the subject of construction in this court more than once heretofore, and the decision of the question before us requires a further critical examination of its provisions. The first five sections of it provide for the establishment of the offices of surveyor-general, two land-offices, with registers and receivers and for the organization of the general land system of the United States, including surveys; and it then proceeds to lay down the rules by which rights to the public lands may be acquired. The granting clause of the sixteenth and thirty-sixth sections of the public lands as thus surveyed, to the State of California, is as follows: —

" Sect. 6. And be it further enacted, that all the public lands in the State of California, whether surveyed or unsurveyed, with the exceptions of sections sixteen and thirty-six, which shall be, and hereby are, granted to the State for the purposes of public schools in each township, and with the exception of lands appropriated under the authority of this act, or reserved by competent authority, and excepting, also, the lands claimed under any foreign grant or title, and the mineral lands, shall be subject to the pre-emption laws of fourth September, eighteen hundred and forty-one, with all the exceptions, conditions, and limitations therein, except as is herein otherwise provided; and shall, after the plats thereof are returned to the office of the register, be offered for sale, after six months' public notice in the State of the time and place of sale, under the laws, rules, and regulations now governing such sales, or such as may be hereafter prescribed."

Sect. 7 of the act may as well be read here, as it is important to a true solution of the question under consideration.

" Sect. 7. And be it further enacted, that where any settlement, by the erection of a dwelling-house or the cultivation of any portion of the land, shall be made upon the sixteenth and thirty-sixth sections, before the same shall be surveyed, or where such sections may be reserved for public uses or taken by private claims, other lands shall be selected by the proper authorities of the State in lieu thereof, agreeably to the provisions of the act of Congress approved on the twentieth of May, eighteen hundred and twenty-six, entitled ' An Act to appropriate lands for the support of schools in certain townships and fractional townships, not before provided for,' and which shall be subject to approval by the Secretary of the Interior. And no person shall make a settlement or location upon any tract or parcel of land selected for a military post, or within one mile of such post, or on any other lands reserved by competent authority; nor shall any person obtain the benefits of this act by a settlement or location on mineral lands."

The twelfth section grants to the State seventy-two sections for the use of a seminary of learning, to be selected by the governor or some one appointed by him, in legal subdivisions of not less than a quarter-section, of any unsold, unoccupied, and unappropriated public lands : " Provided, however, that no mineral lands, or lands reserved for any public purpose what-

ever, or lands to which any settler may be entitled under the provisions of this act, shall be subject to such selection."

The thirteenth section also grants the State ten sections of land for the purpose of erecting the public buildings of the State, with the same proviso as the one to sect. 12.

The proviso to the third section is also relied upon as indicative of the purpose of Congress in regard to the mineral lands of California. That section contains the authority under which the surveyor-general is to act in surveying the public lands in that State, and after investing him with the powers conferred on other surveyors-general, and prescribing some specific directions for the survey of private land-claims, it is " *Provided*, that none other than township lines shall be surveyed where the lands are mineral, or are deemed unfit for cultivation ; and no allowance shall be made for such lines as are not actually run and marked in the field, and were actually necessary to be run."

It is strongly urged by plaintiff's counsel that the language of the granting clause imports a grant *in præsenti*, and that wherever by any survey of the government thereafter made the location of the sixteenth and thirty-sixth sections of a township is ascertained, it establishes the title in the State from the date of the statute, namely, March 3, 1853.

It is quite unnecessary to enter upon this question, which has been before us in so many shapes ; for, if it be conceded that such would be the effect of the statute if there were no words of exception in the grant, Congress has, in nearly every case where the question has arisen, made such specific exceptions to the operation of the grant as to decide the matter without resort to the rule of construction asserted by plaintiffs.

Take, for instance, railroad grants. Besides the more general reservations from the grant, there is almost always found a provision that where, by the location of the road, the sections on each side of it, which would pass by the general terms of the grant, are ascertained, those which have been pre-empted, sold, or otherwise disposed of shall not so pass, but the grantee may select other lands in lieu of those, which may be said in this manner to be excepted out of the grant.

This is true of the statute under consideration, and we may

pass this branch of the argument by conceding that if the land in controversy is subject to the grant the title relates to the date of the act of Congress.

Defendants allege that it is not so subject to the grant, for two reasons : —

1. That it is mineral land, and that the grant of school lands to the State does not cover any mineral land. ·

2. That by virtue of the seventh section such settlement and cultivation had been made on the land before the survey was · made, as to take it out of the grant, and remit the State to the selection of other public land in lieu of this.

We will consider these in their order.

Very soon after the conquest of California and its cession to the United States by Mexico, it was found to be rich in the precious metals, and such was the rapid influx of immigrants from the Eastern States that the California population at the time it was organized as a State in 1850 was largely composed of mining camps and settlements engaged in mining these metals. As nearly all those mines were discovered on land the title of which was vested by the treaty in the government of the United States, it became important to determine what course the government would take with regard to this new source of untold wealth. The Spanish government, to which this territory and much other, rich in precious metals, had once belonged, had instituted a system of laws concerning her mines by which private enterprise was invited to develop them, and a revenue secured at the same time to the crown, which made Spain for a time the richest of the civilized governments of the world. ·This system Mexico had inherited and perpetuated, and there were many American statesmen who believed that with the territory we had acquired the laws which governed the production of gold from the earth. Others believed that, whether this were so or not, it would be a wise policy for the government to secure to itself a fair proportion of the metal produced from its own ground. But, while Congress delayed and hesitated to act, the swarm of enterprising and industrious citizens filled the country, and, before a State could be organized, had become its dominating element, with wealth and numbers and claims which demanded consideration.

Matters remained in this condition, with slight exception, until July 26, 1866, when Congress passed a law by which title to mineral land might be acquired from the government at nominal prices, and by which the idea of a royalty on the product of the mines was for ever relinquished.  14 Stat. 251.

During this period, however, from 1849 to 1866, the system of the disposition of the public lands in general had to be introduced into California, and grants of land were made to the State for various purposes, also to railroad companies; and in all this the attention of Congress was necessarily turned to the distinction between mineral lands and the ordinary agricultural lands of the other Western States to which similar laws had applied.  This distinction is nowhere more plainly manifested than in this act of 1853.  As we said in *Sherman* v. *Buick* (93 U. S. 209), the main purpose of that act was to provide for the survey and sale of the public lands and for the right of pre-emption to the settler on them, and there was embraced in this clause of pre-emption the grant of the sixteenth and thirty-sixth sections to the State for school purposes.  In the very sentence which contains this grant in parenthesis, and while introducing the new principle, that the public lands should be subject to the right of pre-emption, whether surveyed or unsurveyed, the mineral lands are excepted, in express terms, from this right and from public sale.

We say that this introduced a new principle in pre-emption law; for, except in a very few cases, no right of pre-emption had before existed until the lands were surveyed, so that the pre-emptor could designate by the description of the congressional survey the precise land to which his pre-emption attached.

But this right of pre-emption, on unsurveyed lands, was by this statute to last but one year; and so careful was Congress to protect mineral lands from sale and pre-emption, that, as we have already shown by the proviso to sect. 3 of the act, the surveyors were forbidden to extend their surveys over them.

The effect of this was as Congress intended it should be, that, as no surveys could be made of mineral lands until further order of Congress, there could be no sale, pre-emption, or other

title acquired in mineral lands until Congress had provided by law for their disposition. The purpose of these provisions was undoubtedly to reserve these lands, so much more valuable than ordinary public lands, and the nature of which suggested a policy different from other lands in their disposal, for such measures in this respect as the more matured wisdom of that body, which by the Constitution is authorized to dispose of the territory or other property of the United States, should afterwards devise

It is a strong corroboration of this view that Congress, in sect. 12 of this same statute giving the State seventy-two sections for a seminary of learning, declares that no mineral lands shall be taken under the grant, and makes the same reservation of its mineral lands in the grant for the erection of public buildings in the State.

We find a similar provision in the grant to the Pacific Railroad Companies, whose road it was known would pass through some of these mineral regions. By the fourth section of the act of 1864 (13 Stat. 356), it is declared that neither that act nor the act of 1862 shall be held to include in the grant "any government reservation or mineral lands or the improvements of any *bona fide* settler on any lands returned or denominated as mineral lands."

As we have already said, Congress, after keeping this matter in abeyance about sixteen years, enacted in 1866 a complete system for the sale and other regulation of its mineral lands, so totally different from that which governs other public lands as to show that it could never have been intended to submit them to the ordinary laws for disposing of the territory of the United States.

Taking into consideration what is well known to have been the hesitation and difficulty in the minds of Congressmen in dealing with these mineral lands, the manner in which the question was suddenly forced upon them, the uniform reservation of them from survey, from sale, from pre-emption, and above all from grants, whether for railroads, public buildings, or other purposes, and looking to the fact that from all the grants made in this act they are reserved, one of which is for school purposes besides the sixteenth and thirty-sixth sections,

we are forced to the conclusion that Congress did not intend to depart from its uniform policy in this respect in the grant of those sections to the State.

It follows from the finding of the court and the undisputed facts of the case, that the land in controversy being mineral land, and well known to be so when the surveys of it were made, did not pass to the State under the school-section grant.

It seems equally clear to us that the land is excepted from the grant by the terms of the seventh section of the act of 1853.

In the case of *Sherman* v. *Buick* (*supra*) we have said in reference to this section that it was unnecessary to decide whether the improvements found on the land when the survey was made and the character of the person owning them should be in all respects those which are prescribed by the general pre-emption law. We are now satisfied that this section prescribes its own rules on that subject, and that whenever, at the time these sections are ascertained by the government survey, there is either a dwelling-house or the cultivation of any portion of the land, on which some one is residing and is asserting claim to it, the title of the State does not vest, but the alternative right to other land as indemnity does. It is only necessary to look to what we have said in *Sherman* v. *Buick*, of the fact that Congress had in view the rapid settlement of the country and the long time which might elapse before it could be known by actual survey where these school sections would be found, to see that a liberal construction must be given to the language by which Congress expresses its purpose to protect these settlements, buildings, and cultivations, and that we have no right to add other qualifying incidents to the exercise of this right than those found in the statute. These are not the same required under the general pre-emption law, and we have no authority to import the latter into the new statute.

Some of the expressions found in *Sherman* v. *Buick* and in *Water & Mining Company* v. *Bugbey* (96 U. S. 165) are supposed by counsel to convey a different meaning; but in the use of the words "pre-emption" and "pre-emptor," in reference to *this section of the statute*, it was not designed to imply all that was meant by those terms in the act of 1841 and its amenda-

tory adjuncts, but to convey the idea of a settlement and a settler according to the terms of the statute under consideration.   Nor is there anything in the principle announced in the latter case, that where a settler abandons his claim to hold the land against the State by virtue of such settlement or improvement, and acknowledges the title of the State by purchase, that his improvement or settlement cannot be set up by a third person to defeat the title of the State recognized by the United States, which conflicts with what we have just said or with the defendants' rights in the present case.   Here the settlement, building, and cultivation have been continuous for twenty years, with constant assertion of claim.   The same parties or their privies are still claiming it.   None of them have accepted title under the State, or acknowledged its right to the land. The government of the United States has given them a patent founded on this very possession, use, and occupation.   Nothing in that opinion justifies the construction placed upon it by counsel, and the case is clearly inapplicable to the one before us.

We are of opinion that the settlement, building, and cultivation found as facts by the Circuit Court bring the case within the provisions of the seventh section of the act of 1853, and necessarily render void the title asserted under the State by plaintiff.

It follows that the judgment of the Circuit Court is right, and it is accordingly

*Affirmed.*

MR. JUSTICE FIELD did not take any part in deciding this case.