## HENRY WOOD.

(*Commissioner McFarland to Register and Receiver, Salt Lake City, Utah, September 17, 1883.*)

SCHOOL SECTIONS IN TERRITORIES.    Coal entries may be made on school sections in the Territories.

I am in receipt of the papers in the application for patent to coal land entry No. 58, made by Henry Wood, October 9, 1882, upon portions of sections 9 and 16 of the public lands of Utah.

Section 15 of the organic act, entitled "An Act to establish a Territorial Government for Utah," approved September 9, 1850, contains the following:

"When the lands in said Territory shall be surveyed under the direction of the Government of the United States, preparatory to bringing the same into market, sections numbered sixteen and thirty-six in each township in said Territory shall be and the same are reserved for the purpose of being applied to schools in said Territory and in the States and Territories hereafter to be erected out of the same."

Do the words of the statute import a grant of said sections 16 and 36 to the said Territory, or such a reservation of them as will require further legislation by Congress to open mineral lands embraced by said sections to entry under the mining laws?

August 8, 1879, Hon. Carl Schurz, Secretary of the Interior, in deciding the question, raised by the U. S. Attorney for Dakota, as to the right of the United States to bring an action for trespass upon sections 16 and 36 of public lands therein reserved by Congress for the use of schools, the language of the statute relating thereto being, in all essential particulars, identical with the one in question, said: "The lands are public lands, although reserved for a particular purpose. The United States has not granted the title to such lands, but has reserved them in order that at some future time, when a State shall be erected out of such Territory, the same may be granted to such State." In *Mining Company* v. *Consolidated Mining Company*, 102 U. S. R., 167, the Supreme Court, in a well considered opinion in which all legislation with reference to the manner of disposal of mineral lands, and the policy of the Government in relation thereto, were reviewed, held that a grant of public lands to the State of California, by the act of March 3, 1853, for school purposes, "was not intended to cover mineral lands, but such lands were excluded from that grant, as they were from all others, by the settled policy of the Government on that subject."

The operative words of the act of March 3, 1853, are "shall be and hereby are granted," and there was no question raised as to the intent of Congress to grant to the State of California the lands, other than mineral, therein specified.

Since, then, it appears settled that it was never the intention of Congress to grant to a State or Territory any mineral land for school purposes, it follows, *a fortiori*, that it cannot be presumed to have been its intention to *reserve* any portion of them to be applied in the future to such purposes. It is proper to remark further that, since in case of the lands in question the United States never parted with its title, it was entirely competent for Congress to exclude the mineral portion thereof (even conceding that a reservation of the same had been made) from such reservation, by the mining act of July 4, 1866, which construction of said act would be in keeping with the decision of Hon. C. Delano, Secretary of the Interior, April 28, 1873, in the Keystone case; the issues in which afterwards came before the Supreme Court in the case of *Mining Company*

*v. Consolidated Mining Company*, cited above, and in keeping with the judgment of said Court therein.    I am therefore of the opinion that the lands in question come within the provisions of the coal land act of March 3, 1873, and are subject to entry thereunder.—*Copp's Land-Owner.*

———————

The insurance companies are rejoicing over a late decision of the Supreme Court of Minnesota in the case of *Nerskin* v. *Northwestern Endowment and Legacy Association.*    This was a benevolent association, and the plaintiff was a member of it, and held a certificate of membership therein, which contained the following clause:    "Peter Nerskin, having complied with the conditions of membership, is entitled to the benefit of the said association (subject to the conditions hereinafter named) in the sum of one dollar for each contributing member, not exceeding the sum of two thousand dollars."    The association contended that it was not to pay absolutely, but that the contract merely required it to make the assessment of one dollar upon each member, and, when collected, to pay the proceeds to the party entitled to it.    But the Court did not take this view. It held that the certificate was an absolute undertaking to pay a sum of money, the amount of which was to be determined by the number of contributing members.    The effect of the decision seems to be to throw upon the shoulders of those members who are willing to pay, the burthen of making up the deficits caused by the failure of others to pay.    We believe that if this decision is correctly reported it is a misconception of the understanding of the members of these companies in contracts of this kind.    The scheme of benefits of these companies is substantially the same; the amount which the beneficiary receives depends upon the voluntary contributions of the members; no member is obliged to contribute beyond a certain sum; and the beneficiary gets only the amount realized from this assessment, and the voluntary payments thereunder.    Any other interpretation of such a contract makes a different contract for the members of such societies from that which they have seen fit to make for themselves; and if it is not a very good and safe contract of insurance, why, it is none of the business of the insurance companies.—*American Law Review.*