## HAWKE V. DEFFEBACH.

1. THE DECISION OF THE SECRETARY OF THE INTERIOR.
   Establishes a presumptive right to land.

2. PATENT FOR LAND--PRESUMPTION FROM.
      A patent from the government for land is evidence of a perfect right established by the final adjudication of the tribunal erected for the special purpose, and carries with it the presumption that every requisite prescribed by law for the acquisition of the title has been duly performed.

3.   SAME—FOR MINERAL LANDS—CONVEYS FEE SIMPLE TITLE.

     A patent for mineral lands conveys to the patentee the common law right to the exclusive possession and full enjoyment of the surface and all below it, as well as the right to pursue a vein beyond the vertical side lines of the surface location.

4.   TOWNSITE ACT—CONSTRUCTION OF SEC. 2386.

     Section 2386 if the Rev. Stats., having been enacted at a time when no provisions of law existed for acquiriug title to mineral lands, was merely precautionary, to protect any possessory mining rights which might be found to exist, within any townsite under local mining customs and regulations then recognized by the government.

5.   TOWNSITE LAW—MINERAL LANDS.

     No title can be acquired under the provisions of the townsite law, to lands known to be valuable for minerals.

6.   MINERALS—SURFACE PROPRIETORSHIP—NO STATUTE AUTHORIZING SEPARATE CONVEYANCE OF.

     There is no law of congress under which the surface proprietorship of mineral lands can be conveyed to one person, and the minerals therein contained to another.

7.   OCCUPYING CLAIMANTS—VALUABLE IMPROVEMENTS—GOOD FAITH.

     An occupant of land in good faith, is one who supposes himself to be the true proprietor of the land, and who is ignorant that his title is contested by some other person claiming a better right to it.

8.   QUERY.

     Whether the claim of one who concedes the right of another to enter upon and remove minerals from land in his possession, possesses the adverse character contemplated by the statute for the benefit of occupying claimants.

9.   OCCUPYING CLAIMANTS—ERECTION OF IMPROVEMENTS—WITH NOTICE —CANNOT RECOVER.

     Where defendant purchased the land in controversy with full notice of plaintiff's claim thereto under the mining law, and that plaintiff was making improvements thereon necessary to acquire title thereto under such mining laws, defendant could not thereafter erect valuable improvements "in good faith," so as to entitle him to recover the value thereof.

Filed February 16, 1885.

Appeal from the district court of Lawrence county.

The facts are fully stated in the opinion of the court.

CHURCH, J.   These cases, with the one following, [Pierce v. Sparks, *post,*] are typical of a series of cases involving the title to a large amount of valuable property in the mining towns of the Black Hills. The two now under consideration present the same essential conditions, and will be so treated;

the facts hereinafter given being those especially pertaining to the one first mentioned. The case of Pierce v. Sparks presents some different features, which will be separately considered. The actions were for ejectment. The plaintiff averred title in fee-simple to lands embracing the premises in controversy by virtue of a patent from the United States conveying said lands to him as a placer mining claim. The entry by defendant Deffebach is alleged to have been made on or about July 1, 1878, with full notice of plaintiff's claim, and after service of written notice not to enter or make any improvements. The answer, denying each and every allegation of the complaint, except as thereinafter stated, set up—first, facts, hereinafter more particularly stated, under which defendant claims an equitable right to a decree that plaintiff holds the premises in trust for him; praying specifically that he be decreed to convey to the defendant said premises in controversy, excepting and reserving to the plaintiff in such conveyance the right to mine and extract the precious metals from said premises, provided that in so doing the plaintiff shall not materially injure, endanger or interfere with the buildings and improvements thereon, and the necessary use, occupation, and enjoyment of the premises by defendant. Second, the same and additional facts by way of counter claim, under which it is prayed "that in the event it should be determined that the plaintiff is the owner and entitled to the possession of said premises, that the separate value of the improvements thereon, and also then that the value of the land, aside from the value of the improvements, be specifically found, and that the defendant have judgment for the value of his said improvements."

The answer also contained the usual prayer for further relief. To each branch of these answers, which were substantially the same in both cases, general demurrers were filed. The demurrers were sustained, with leave to answer over; but the defendants electing to stand on the order sustaining the demurrer, judgments were entered for the plaintiff, in which, by stipulation without prejudice, the damages for detention, and for use and occupation, were assessed at one

dollar each.   From these judgments these appeals are taken.

Recurring now more specifically to the case of Deffebach. Upon the first branch of the case, in which the main question involved is the title to the premises in controversy, these facts may, for the purpose of the demurrer, be considered as admitted: First.   That on February 28, 1877, the day upon which the treaty opening the Black Hills for settlement went into effect, a considerable tract of land, embracing the premises in question, was settled upon and occupied, by a population of some 2,000 people, for purposes of business and trade, and other municipal purposes, and laid out into lots, blocks, streets, and alleys, comprising the town of Deadwood, and that the premises in question, as one of the lots so laid out, then were and ever since have been occupied and possessed for municipal purposes by the defendant or those under whom he claims.   Second.   That on November 20, 1877, plaintiff made application to the United States land office at Deadwood for a patent for a certain p'acer claim, embraciug these premises, and that on January 31, 1878, plaintiff duly entered said lands at that office for said patent, paid the price, and received the usual receipt.   Third.   That plaintiff's placer claim was not located or claimed by plaintiff or any other person until after the selection, settlement upon, and appropriation of the land as aforesaid for townsite purposes.   Fourth. That on July 29, 1878, the said townsite of Deadwood, embracing within its limits the plaintiff's placer claim, was entered at the same land office by the probate judge of Lawrence county, under the provisions of the townsite act of 1867, in trust for the use and benefit of the occupants thereof, including the defendant.   Fifth.   That thereafter, a controversy having arisen between the plaintiff [in common with other persons similarly situated] and said probate judge, as trustee for said townsite occupants, as to their respective rights to a patent for these lands, the commissioner of the general land office, April 10, 1879, ordered a hearing before the Deadwood land office, between the parties, which hearing was restricted by the order of the commissioner to the single question of the mineral or non-

mineral character of the land, and that, although the defendant and other beneficiaries under said trust offered at the hearing to prove, and did prove, their prior selection, use and occupation of said land for townsite purposes, and no dispute was made as to the facts in this respect, yet the local land officers, and subsequently, upon appeal, the commissioner, and finally the secretary of the interior, excluded such proof from consideration; and having determined from the evidence adduced that the land was valuable for minerals, cancelled the entry made by the probate judge, in so far as it included these lands, and granted a patent to the plaintiff, pursuant to his said application and entry, which patent was issued January 31, 1882.

It was held by the learned secretary under whose decision the patent issued, that, it having been established that these lands were valuable for minerals, being placers, they "were not subject to townsite entry; and to that extent"—that is, to the extent that it embraced such lands,—"the townsite entry of Deadwood should be cancelled;" and, further, that the surface being absolutely required for the full enjoyment of the lands by either placer or townsite owners, it is not competent to insert clauses of reservation in the townsite or mineral patents. This last ruling was made in response to a claim made on behalf of the townsite occupants, that, instead of cancelling any part of the townsite entry, a patent should be issued for the whole, containing a reservation protecting "valid mining claims and possessions," and that patents should be issued to the plaintiffs and other mineral claimants, containing reservations or exceptions protecting the surface proprietorship of the townsite occupants. If this decision was correct, it disposes of that branch of the case now under consideration.

This determination presumptively establishes plaintiff's right to the ground in controversy, and, unless it appears from the facts averred in the answer that the land department, in granting that patent, committed some error of law, whereby the defendant's rights were prejudiced, that presumption is conclusive. The patent is evidence of a perfected right estab-

lished by the final adjudication of the tribunal erected for the special purpose, and carries with it the presumption that every requisite prescribed by law for the acquisition of title has been duly performed. Smelting Co. v. Kemp, 104 U. S. 636; Steel v. Smelting Co., 106 U. S. 447, and cases cited.

It will be observed, as implied in this proposition, that, in order to avail himself of any error which may have been committed by the department, the defendant must show some legal or equitable right in himself; such that if the error should be corrected he would be entitled to the land in controversy. Cases above cited; also, Johnson v. Towsley, 13 Wall. 72. Such an error, the defendant claims, was committed by the department in restricting the hearing, upon the controversy above referred to, to the question of the mineral or non-mineral character of the land, and in ignoring the proof submitted of the prior occupancy of the premises for townsite purposes; and the defendant, therefore, claims that the plaintiff should be adjudged to hold the premises as his trustee, and decreed to convey the same to him accordingly. The propriety of this species of relief, in a proper case, may be conceded. It is in accordance with the doctrine of numerous cases in the state and United States courts. Stark v. Star, 6 Wall. 418; Quinby v. Conlan; 104 U. S. 420. Its applicability to the present case is the main ground of contention.

Passing by, for the present, the question whether the defendant could, in this indirect way, acquire a title for townsite purposes, to land not in fact embraced within the limits of any patented townsite, or whether the desired relief should not be sought in the name of the probate judge as trustee for all of the townsite occupants, I proceed to consider the main question arising upon this demurrer. The policy of the government to reserve from sale and from the operation of ordinary grants, general and special, its mineral lands, has been declared in so many statutes, and by so many adjudications of the supreme court of the United States, that it is unnecessary, at this time, to enter upon an extended review of the history of its legislation in this regard. One or two citations will be sufficient to

show with what emphasis the policy referred to has been declared. In the case of U. S. v. Gratiot, 14 Pet. 538, decided in 1840, the court say: "It has been the policy of the government at all times, in disposing of the public lands, to reserve the mines for the use of the United States; and their real value cannot be ascertained without causing them to be explored and worked under proper regulations." And again, in the case of The Ivanhoe Mining Co. v. Consolidated Min. Co., 102 U. S. 174, decided in 1880, the court, after speaking of the established policy of the government in respect of its mineral lands, say: "Congress enacted, in 1866, a complete system for the sale and other regulation of its mineral lands, so totally different from that which governs other public lands, as to show that it could never have been intended to submit them to the ordinary laws for disposing of the territory of the United States."

Prior to the year 1866, although the privilege of exploring the public lands for mineral deposits, and of extracting and appropriating the precious metals, had been conceded in various ways by the government, no statutory regulation of the privilege had been adopted, nor had the government indicated any general purpose to part with its title to mineral lands upon any conditions. In 1866, however, a statute was enacted, (14 U. S. St. at Large, 251,) which, as has already been stated in the decision of the supreme court last quoted, provided a complete system for the sale and other regulation of these lands. The mineral lands of the public domain were thereby declared to be free and open to exploration and occupation, under certain conditions therein mentioned, and provision was made for the issuing of patents to those who might desire to purchase. This latter provision, in terms, applied only to veins or lodes of quartz or other rock in place. By the amendment of 1870, however, (16 U. S. St. at Large, 217,) the right of purchase was extended to placer claims; and by the act of 1872, entitled, "An act to promote the development of the mining resources of the United States," (17 U. S. St. at Large, 91,) both of the preceding acts were practically revised and consolidated, and it was enacted that "all valuable mineral deposits in lands

belonging to the United States, both surveyed and unsurveyed, are hereby declared to be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase," as therein provided; and this is the law as it stands in the Revised Statutes, § 2319. Section 2318, of the Revised Statutes is as follows: "In all cases, lands valuable for minerals shall be reserved from sale, except as otherwise expressly directed by law." By Section 2325 it is provided that "a patent for any land claimed and located for valuable deposits, may be obtained in the following manner: * * * And [the applicant] shall thereupon be entitled to a patent for the land."

Thus it will be seen that after providing that lands valuable for minerals shall be reserved from sale, except as otherwise expressly directed by law, and that all valuable mineral deposits in public lands are open to exploration, occupation, and purchase under regulations prescribed by law, congress proceeds to prescribe how these valuable lands may be occupied and purchased, and under what terms they will be sold and title to them conveyed by the United States. And it should be noticed that the patent, when issued, is for the land, and it conveys to the patentee not only the common-law right to the full enjoyment of the surface and all below it, but also the right, in the case of a vein, to pursue that vein throughout its entire depth, even though it may pass beyond the vertical side lines of the surface location.

Such being the law in relation to mineral lands, it is contended by the defendent that such lands are nevertheless subject to entry for town-site purposes, and that if the town-site occupant has selected and occupied, for purposes of business or trade, any mineral land before it has been located or occupied for mining purposes, he is entitled to have it included in the town-site entry, and to receive a deed for it from the trustees, and that, where mining claims have been located prior to the actual entry of the town-site, patents should issue to both parties, with the respective reservations above indicated, protecting such mining claims and possession on the one hand, and the surface proprietorship and improvements of the town-

site occupants on the other. These propositions are based mainly upon the construction given by defendant to Sections 2386 and 2392 of the Revised Statutes, which constitute part of the present chapter relating to town-sites upon the public lands, although not of the law of 1867 as first enacted. Section 2386 is as follows: "When mineral veins are possessed, which possession is recognized by local authority, and to the extent so possessed and recognized, the titles to town lots to be acquired shall be subject to such recognized possession and the necessary use thereof, but nothing contained in this section shall be so construed as to recognize any color of title in possessors for mining purposes as against the United States."

It is argued by defendants' counsel that this section is a legislative recognition of and provision for cases where mineral lands are embraced within the limits of town-sites, and that it follows from such recognition and provision that the legislature did not intend to reserve mineral lands from town-site entry, but only to protect existing possessory rights of miners in vein or lode claims. This argument is doubtless based upon, and derives some support from, a decision of the honorable secretary of the interior, of June 6, 1876, in the case of the Town-site of Central City, Colorado, v. Mineral Claimants, to the effect that the mineral and town site laws, referring to Section 2386, permit town-site entries overlaying lode claims, and that a surface proprietorship by the town is compatible with an adverse ownership of veins of ore beneath. In accordance with this decision, patents for vein or lode claims within the limits of town-sites have been and are issued, with a clause excepting and excluding all town-property rights upon the surface, and all houses, buildings, structures, lots, blocks, streets, alleys, or other municipal improvements on the surface, not belonging to the patentees, and all rights necessary or proper to the occupation, possession, and enjoyment of the same; and town-site patents are issued embracing the same land, with the reservation of mining rights above referred to. In other words, as it seems to me, a precautionary enactment, obviously designed for the protection of the miner in pursuance of the then already

well-defined policy of the government to encourage the development of its mineral resources, is so construed as not only to deprive the miner of some of the most valuable rights and privileges expressly secured to him by other statutes, but to confer upon the townsite occupants rights and privileges, from which by other statutes they are expressly excluded; for this land, being "valuable for minerals," is by the statute reserved from sale unless expressly directed by law. Not only the mineral deposit, but the land itself, is so reserved, and is open to exploration, occupation, and purchase by the miner. A price is fixed for the land much beyond that demanded for town-site lands, which may be entered at the minimum price, and the patent which the law provides conveys the land in fee.

Moreover, it is expressly provided by Section 2322 that the locators of mining claims shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations. And surely it cannot be contended that one who purchases and receives the patent of the United States for his mining claim, acquires by that deed rights less extensive than those which he has theretofore held by mere location and occupation. A sale is as much prohibited by law of congress, when to allow it would defeat the object of that law, as though the inhibition were, in direct terms, declared. Shepley v. Cowan, 91 U. S. 336.

I know of no rule of construction which would give to this Section 2386 the effect claimed for it, or disclose in it any purpose to permit town-site entry upon known mineral lands. On the other hand, I think the construction insisted upon by the defendants opposed to the letter and whole spirit of the laws relating to the disposal of the mineral lands of the United States. The case of U. S. v. Gear, 3 How. 120, is instructive upon this point. By the act of 1807 it was provided that the several lead mines in Indiana should be reserved for the future disposal of the United States, and any grant which might thereafter be made for a tract of land containing a lead mine, which had been discovered previous to the purchase of such tract from the United States, should be considered fraudulent and null.

By another act, passed in 1834, authority was given to the president to cause to be offered for sale all the lands lying in certain land districts, (within the former Territory of Indiana,) reserving only Section 16 in each township, with certain other specified reservations, and concluding with the words, "any law of congress heretofore existing to the country notwithstanding."

It was contended by the deferdant that, as certain reservations were made in the statute of 1834, lead mines not being among them, and as the act contained a general disaffirmance of all previous conflicting acts, lands containing lead mines were open for entry. But the court say: "The reservations in the fourth section of the act of 1834 are limitations upon the authority to sell, and not an enlargement of the general power of the president to sell lands which by law he never had a power to sell, which have always been prohibited from being sold, and which hever have been sold, except under the authority of some special statute." "Authority, then, to sell all lands in these districts, though coupled with the concluding words of the fourth section, can only mean all lands not prohibited by law from being sold, or which have been reserved from sale by force of law." And, again, after stating that these two statutes did not present a case where the latter act must be held to modify or repeal the earlier, the court proceeds as follows: "The rule is that a perpetual statute, (which all statutes are unless limited to a particular time,) until repealed by an act professing to repeal it, or by a clause or section of another act, directly bearing in terms upon the particulur matter of the first act, notwithstanding an implication to the contrary may be raised by a general law which embraces the subject matter, is considered still to be the law in force as to the particulars of the subject-matter legislated upon."

Perhaps the pertinency of the foregoing observations to the case at bar may be somewhat more apparent when we consider the circumstances under which Section 2386 was enacted. It is true that it now forms a part of the entire system of laws designated as the Revised Statutes, approved June 22, 1874, of

which the laws hereinabove cited, relating to the disposition of mineral lands, are also a part; and this fact alone may be considered to forbid the idea that this section was intended to operate as a removal or modification of the limitations imposed by those laws upon the sale of mineral lands. But I think we are not precluded from an examination of the original statute, and ascertaining from it, if possible, its primary purpose. McDonDonald v. Hovey, 110 U. S. 619. This section was first enacted as the concluding proviso of an act approved March 3, 1865, (13 U. S. St. at Large, 529,) supplemental to an act approved July 1, 1864, for the disposal of coal lands and town property in the public domain. The act of 1864, (Id. 343,) among other things, provided that upon the establishment of a town upon the public lands in the manner therein prescribed, it should be lawful for the president to cause the lots to be offered at public sale to the highest bidder, subject to a minimum price of $10 per lot, and that such lots as might not be disposed of at such sale should thereafter be liable to private entry. The supplemental act contained some further provisions as to the price of such lots, and concluded with a proviso in the words which now constitute Section 2386.

It seems clear, therefore, in the first place, that this section applies only to town lots acquired under the provisions of the preceding sections of this chapter, comprising the acts of 1864 and 1865, just referred to. See McDonald v. Hovey, *supra.* And in view of the fact that at the time the section was first enacted no provision whatever had been made for the acquisition of title to mineral lands, nor had there been any statutory regulation of the possessory rights of miners, I think it equally clear that the purpose of this section was precautionary, to protect any mining rights which might be found to exist within any such town-site under these local customs and regulations, which have been frequently recognized by the government. If it be asked why congress did not then expressly prohibit the acquisition of title to mineral lands under the provisions of that act, it may be answered, for the same reason, that the act of 1834, above referred to, contained no such prohibition,—

none was necessary. The president was authorized to cause these lots to be offered for sale, and it was not to be supposed that he would offer for sale, as town lots, any lands known to be valuable for minerals, in opposition to the well-established policy of the government; yet many cases might arise to call into operation the provisions of this section; for instance, land might be claimed as non-mineral which was actually in possession of a miner; or a miner's claim, located and worked in accordance with local customs and regulations, might embrace more of the surface than the claimants of the townsite should deem necessary; or the miner, in pursuit of his vein or lode, might find it extending beyond the surface lines of his claim, and under the surface of an adjoining town lot. In all such cases the possessory rights of the miner would be protected by this statute; and in this connection it is significant that by Section 2 of the act of 1866, (14 U. St. at Large, 251,) it is expressly provided that land adjoining any lode claim shall be sold subject to this condition.

I can find no warrant whatever in this section for the claim of the defendant, that lands known to contain valuable mineral deposits are, nevertheless, open to town-site entry. The construction I have given it is in harmony with the entire policy of the government respecting its mineral lands, and, at least, does not lead to the anamoly of two conveyances of the same land to different parties for different purposes, each requiring, for that full enjoyment contemplated by the law, the exclusive possession of the entire surface. But it is insisted by the defendant that Section 2392 affords further manifestation of the legislative intent to permit town-site entries upon mineral lands; and this for substantially the same reason before urged. viz., that because certain specified mining rights are expressly protected, mineral lands in general are thereby opened to entry,—a sort of reversal of the old maxim, which would make it read, *exclusio unio est expressio alterius*, with a new and enlarged meaning. Let us examine this section. Its first sentence was enacted March 2, 1867, as the concluding proviso of an act for "the relief of the inhabitants of cities and towns upon the pub-

lic lands," (14 U. S. St. at Large, 54.)   The town-site law un-
der which the Deadwood entry was made.   It then comprised
only the first sentence of the present section, viz., "that no
title shall be acquired, under the provisions of this act, to any
mine of gold, silver, cinnabar, or copper."   There was consid-
erable discussion, upon the argument of this case, as to the
meaning of the word "mine" in this section; the defendant in-
sisting that it must be limited to veins or lodes of minerals.
But, upon a careful examination of the statutes, I am satisfied
that the word "mine," in this section, is nearly synonymous
with the word "deposit," or, possibly, with the words "land
containing deposits."

Section 2318 speaks of "lands valuable for minerals;" Section
2319, of "valuable mineral deposits;" Section 2323, of tunnels run
"* * * for the discovery of mines," (here equal to mineral de-
posits;) Section 2325, of land located for "valuable deposits;" and
Section 2392, of "mines of gold," etc.; and all these, I think, refer
to substantially the same thing, and embrace both veins or lodes
and placers.   I think it clear, also, that the proviso was in-
serted solely in pursuance of the usual policy of reservation
and exception of lands valuable for minerals, to prevent the ac-
quisition of title to such lands under the provisions of the town-
site act, which designates as open to entry for town-site pur-
poses thereunder "any portion of the public lands   *   *   * set-
tled upon and occupied as a town-site, not subject to entry un-
der the agricultural pre-emption laws."   Rev. St. § 2387.   So
far, therefore, from strengthening the claim of the defendant,
this proviso, as it seems to me, utterly defeats it, for it makes
it incumbent upon him, before he can obtain a patent for this
land for town-site purposes, to show affirmatively that the land
does not contain mines of gold, etc.   So, at least, the supreme
court of the United States has held, in a case which seems to
present just this question,—the case of Secretary v. McGarra-
han, 9 Wall. 298.   The act to quiet land titles in California,
July 23, 1866, provided that "where persons in good faith, for
valuable consideration, have purchased lands of Mexican grant-

ees, which grants have been subsequently rejected, and have used, improved, and continued in the actual possession of the same, and where no adverse right or title exists, such purchaser may purchase the same under regulations, etc.; provided, that the right to purchase, herein given, shall not extend to lands containing mines of gold, silver, copper, or cinnabar." The court held that it was necessary for a clamant under this act to aver and prove that the lands did not contain mines of gold, silver, copper, or cinnabar, as necessary for him to aver and prove that he was a purchaser in good faith and for a valuable consideration, and that if the lands did in fact contain such mines he was not entitled to a patent. It is difficult to distingnish that case in principle from the one at bar. The remaining words of this section, "or to any valid mining claim or possession held under existing laws," are first found in the act of 1868, (15 St. at Large, 67,) amendatory of the act of 1867, where they are inserted as a distinct proviso, independent of the words with which they now stand connected.

The meaning of the term "mining claim" has been defined by the supreme court in the case of Smelting Co. v. Kemp, 104 U. S. 649, as follows: "A parcel of land containing precious metals in its soil or rock;" and as the subject of the argument in that cause was a placer claim, of course the definition of the court included such claims. True, at the time this proviso was first enacted placer claims had not as yet been the subject of express statutory regulation or recognition, but they formed a very important part of the mining industry of the country, and as the words used are broad enough to include them, there is every reason to suppose that they were within the immediate contemplation of the makers of the law. Their purpose, too, seems clear. It was evidently similar to that already pointed out with reference to Section 2386, to protect any mining claims which might be found to exist within the limits of any townsite. Possibly they were unnecessary for this purpose, and were introduced out of abundance of caution.

The case of Morton v. Nebraska, 21 Wall. 660, presents a similar instance. The enabling act of Nebraska, April 19,

1864, after granting to the new state certain salt springs, contained the following provision, viz.: "That no salt spring or land, the right whereof is vested in any individual or individuals, shall, by this act, be granted to said state." Morton, in September, 1859, prior to the enabling act referred to, holding certain military bounty land-warrants, issued under the act of 1850, which declared that such warrants might be located upon any of the public lands in that district then subject to private entry, located his warrants upon certain lands which, at the time of the entry, he knew contained salines, and, having received a patent for them, contended that this location was ratified by the proviso above cited. But the supreme court, in passing upon the question, said: "Whether this legislation was necessary to save salt springs claimed under the French treaty, it is not important to determine, but manifestly it had this purpose in view, and nothing more. It could not refer to salt springs not then claimed, because all entry upon them was unlawful, on account of previous reservation. This proviso can have little significance in the enabling act of Nebraska, nor, indeed, in many other enabling acts, but congress thought proper to introduce it out of superabundance of caution." The patent in this case was held void, because issued upon lands reserved from sale.

I will cite but one more case, and it is one which seems to me conclusive upon the question raised by this demurrer. It is the case of Steele v. Smelting Co. 106 U. S. 447. Speaking of the frequent discovery of mineral deposits "within the limits of what may be termed the site of the settlement or new town, Justice FIELD, delivering the opinion of the court, says: "To such claims the miner acquires as good a right as though his discovery was in a wilderness removed from all settlement, and he is equally entitled to patent for them." Again, referring in express terms to these very sections,—2386 and 2392,—he says: "The acts of congress relating to town-sites recognize the possession of mining claims within their limits, and forbid the acquisition of any mine of gold, silver, cinnabar, or copper within them under proceedings by which title to other lands

there situated is secured; thus leaving the mineral deposits within town-sites open to exploration, and the land in which they are found to occupation and purchase, in the same manner as such deposits are elsewhere explored and possessed, and the lands containing them are acquired. Whenever, therefore, mines are found in lands belonging to the United States, whether within or without town-sites, they may be claimed and worked, provided existing rights of others from prior occupation are not interfered with. Whether there are rights thus inter-fered with which should preclude the location of the miner, and the issue of a patent to him, is, when not subjected under the law of congress to the local tribunals, a matter properly cognizable by the land department, when application is made to it for a patent. And the inquiry thus presented must necessarily involve a consideration of the character of the land to which title is sought, whether it be mineral, for which a patent may issue, or agricultural, for which a patent should be withheld."

It is unnecessary to pursue this subject further. I have considered it somewhat at length because of the great importance of the issue, and also because, so far as I am aware, this precise question has never come before any of our courts for adjudication. We think it clear that no title can be acquired under the provisions of the town-site law to lands known to be valuable for minerals, but that such lands are free and open for exploration, occupation, and purchase for mining purposes. And, although the late secretary of the interior was manifestly correct in holding that the whole surface is necessary to the full enjoyment of the lands by either placer or town-site owners, yet that circumstance can hardly be considered as of much importance in the determination of this case, because the statute guarantees to the patentee of a mining claim the full and enclusive possession and enjoyment of the land, with all that it contains, and any exception or reservation in any such patent, not expressly provided by statute, would be without authority of law and therefore void. It follows from these views that the defendants are in no position to assail plaintiff's title, since, if his patent were out of the way, they would not be entitled to one. We conclude that

there was no error in the ruling of the department, or in the issuance of a patent to the plaintiff, by which the rights of the defendants were prejudiced, and that the judgment of the district court upon this branch of the answer was therefore correct.

This brings me to the consideration of the demurrer to that portion of the answer which sets up as a counter-claim the claim of the defendants for the value of improvements erected by them upon the land. The principal allegations of the answer in this behalf, besides those already stated, are: (1) That on the twenty-eighth of February, 1877, the day when, by the removal of the Indian reservation, the Black Hills country was open to legal settlement, one Henry B. Beaman, being one of the inhabitants of said town-site of Deadwood, was in the peaceful and lawful possession of the land in question, claiming to be the owner, and having improvements thereon; (2) that on the 6th of July, 1878, Beaman, being still in the lawful, quiet and peaceful possession of this land, and claiming title thereto, sold and conveyed it by good and sufficient deed to the defendant, who purchased the same in good faith, and for a valuable consideration, and has ever since occupied and possessed the same, holding under said deed, and claiming title thereto in good faith, adversely to plaintiff's; (3) that before plaintiff acquired title to the land, defendant, in good faith, made certain permanent improvements on the premises, viz., a two-story frame building and cellar, and other improvements, of the value of $1,300; (4) that the value of the land, aside from the improvements, does not exceed $100.

This claim was apparently based upon Section 641 of the territorial Code of Civil Procedure, which provides that "in an action for the recovery of real property upon which permanent improvements have been made by a defendant, or those under whom he claims, holding under color of title adversely to the claim of the plaintiff, in good faith, the value of such improvements must be allowed as a counter-claim by such defendant." The three following sections regulate the practice in such cases. Very little was said by appellant's counsel upon the argument on this branch of the case. His original brief makes no refer-

ence to it whatever, and his supplemental brief dismisses the matter in four lines. We are not, therefore, advised very fully as to his position upon this subject. By the organic act the legislature is expressly forbidden to pass any law interfering with the primary disposal of the soil, or any law impairing the rights of private property. Whether the territorial statute is obnoxious to the inhibition last mentioned, is a question which, though suggested upon the argument, we do not deem it necessary to determine; nor have we quoted these sections of the statute upon this subject, out of which the conflict is supposed more especially to arise. Similar questions have been mooted, and have met with various determinations by courts; but we think the cases before us can be disposed of upon other grounds.

As to whether any application of the statute to these cases would bring it into conflict with the provisions of the organic act first mentioned, as being an interference with the primary disposal of the soil, may, perhaps, be thought to depend somewhat upon the further question, when did the legal title of the premises become vested in the plaintiff? Was it before or after the improvements were made? For it is manifest that, standing by itself, the territorial statute could have no operation or effect so long as these lands were the property of the United States, and that the patent of the government would carry with it the full and unincumbered title, free from every adverse claim, since it would be impossible for any one to hold adversely or in good faith against the government, and hence to acquire any right, legal or equitable, to compensation for improvements erected while the title was yet in the United States. Steel v. Smelting Co., 106 U. S. 456. It is supposed, however, that the statute may derive some vitality from an act of congress passed June 1, 1874, (Supp. Rev. St. 25,) entitled, "An act for the benefit of occupying claimants," which provides "that when an occupant of land, having color of title, in good faith, has made valuable improvements thereon, and is, in the proper action, found not to be the rightful owner thereof, such occupant shall be entitled in the federal courts to all the rights and remedies, and,

upon instituting the proper proceedings, such relief as may be given or secured to him by the statutes of the state or territory where the land lies, although the title of the plaintiff in the action may have been granted by the United States after said improvements were so made." The last clause of this statute undoubtedly discloses its motive, and it is possible that the statute might have a very important bearing upon the inquiry as to what, in any case arising under it, would constitute color of title; but, whatever may be its scope or the extent of its application, we cannot suppose that it was designed to effect any alteration in the rules by which it is to be determined whether, in any given case, improvements have been made "in good faith;" and it is right here, we think, that the claim of the defendant fails. His claim is that after the purchase from Beaman of the premises, "and before the plaintiff acquired any title thereto, defendant in good faith made permanent improvements." It will be noticed that this averment is somewhat avasive in the statement which it professes to make of the relation between the time when the improvements were made and the time when plaintiff acquired title. Its value must be determined by a comparison with other admitted facts. Let us look at the dates of these transactions. Plaintiff's application for patent was filed November 20, 1877; his entry was made January 31, 1878; defendant purchased of Beaman July 6, 1878; the townsite entry of the probate judge was made July 28, 1878; the hearing before the land office was ordered April 10, 1879; plaintiff's patent issued January 31, 1882.

Now, it is evident that plaintiff must have acquired title either by his entry, January 31, 1878, or by his patent, January 31, 1882. To which of these dates does the claim of the defendant refer? Obviously not to the former, because defendant himself acquired no title until nearly six months after that. It must, therefore, refer to the latter, and by well settled rules of pleading it may be considered, in favor of the plaintiff, that the alleged improvements were made just prior to the last-mentioned date, and therefore at or even after the time when by the contest in the land office, and the decisions rendered there-

on, he had become fully appraised, not only of the nature and extent of plaintiff's claim, but of the inherent weakness of his own.　Yet it can matter little at what date after his purchase these improvements were made by the defendant.　The application of November 20, 1877, and the entry of January 31, 1878, were open and notorious acts, by which all the world was appraised of the claim of the plaintiff.　More than this: taken in connection with the patent afterwards issued, they furnish conclusive evidence of such actual possession of the premises by the plaintiff, and the doing of such amount of work thereon, and the performance of all such other acts, as the law required to enable him to acquire title.　Steel v. Smelting Co. *supra*. When, therefore, the defendant purchased these premises from Beaman, he must be presumed to have had full knowledge of the plaintiff's claim, and it was impossible for him, with such knowledge, to proceed "in good faith" to erect valuable permanent improvements.　A definition sometimes given of "good faith," and one sufficiently broad to cover this case, is, "without notice."　The 'betterment statutes," as they are often called, are derived from the doctrine of the civil law; speaking of which, in the important and instructive case of Green v. Biddle, 8 Wheat. on page 79, Justice WASHINGTON, for the court, says:　"The exemption of the occupant, by that law, from an account for profits, is strictly confined to the case of a *bona fide* possessor, who not only supposes himself to be the true proprietor of the land, but who is ignorant that his title is contested by some other person claiming a better right to it. Most unquestionably, this character cannot be maintained for a moment after the occupant has notice of an adverse claim, especially if that be followed up by a suit to recover the possession.　After this he becomes a *mala fide* possessor, and holds at his peril, and is liable to restore all the mesne profits, together with the land."　And in a very recent case, the same court cites with apparent approval the observations of the supreme court of Mississippi in Cole v. Johnson, 53 Miss. 94, in the course of which, after saying that "good faith" is used in contradistinction to "bad faith," that court proceeds:　"Our view

is that, in order to deprive the occupant of land under color of title of the value of the permanent improvements erected thereon, there must be brought home to him either knowledge of an outstanding paramount title, or some circumstance from which the court or jury may fairly infer that he had cause to suspect the validity of his own title."

In cases where the courts have had occasion to define who were included in the designation "subsequent purchasers and incumbrancers in good faith," and similar phrases, the rule has been laid down with still greater strictness. Chancellor KENT thus states the rule in equity in this class of cases: "If a purchaser wishes to rest his claim on the fact of being an innocent *bona fide* purchaser, he must deny notice, even though it be not charged, and he must deny it positively and not evasively; he must even deny fully and in the most express terms every circumstance from which notice could be inferred. Denning v. Smith, 3 Johns. Ch. 345.

A further question is suggested as arising out of the circumstance that defendant's claim is not, and, by his own showing, was not before the land office a claim of full title to the premises in controversy, but only that the patent to plaintiff should contain an exception or reservation of the town property rights, and all houses, buildings, lots, blocks, streets, alleys, and other improvements, and that he now concedes the right of the plaintiff to mine and extract the precious metals, so far as this can be done without endangering the surface improvements. It may well be doubted whether such a claim could be said to possess that adverse character contemplated by the statute, since as we have already observed, there is no law under which the surface proprietorship could be conveyed to one and the minerals to another; but the principles already enunciated in respect to the essential element of "good faith" must control the disposition of these cases. Upon this branch of the cases, as upon the other, we think the judgment of the district court was correct, and it is therefore affirmed.

HUDSON, J., concurs, EDGERTON, C. J., dissents, PALMER, J., not having been a member of the court at the time of the argument, did not vote.