## AMERICAN COAL MINING CO. v. SPECIAL COAL AND FOOD COMMISSION OF INDIANA et al.

(District Court, D. Indiana. October 2, 1920.)

No. 347.

1. **Injunction ⟝11—Will not issue to restrain interference with contracts and interstate commerce not threatened.**

   Even though complainant has a right under the federal Constitution to have his contracts not impaired, and to engage in interstate commerce without restriction by a state coal commission, an injunction restraining interference with such rights by the commission will not be issued, before the commission makes an order, the enforcement of which would violate those rights.

2. **Injunction ⟝75—Nonliability for license fees not ground, in absence of showing want of remedy at law.**

   The nonliability of a coal mining company for license fees under a statute creating a state coal commission is not ground for an injunction against the commission, where, so far as the court's information of the state law went, plaintiff would have an adequate remedy by paying under protest and bringing action to recover the amount paid.

⟝For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. **States ☞1—Have general sovereign powers.**

The states have all the powers of an absolute unrestrained sovereign, except so far as certain powers have been surrendered to the federal government; while the federal government, is one of enumerated, specially defined powers and powers essential to those specifically granted.

4. **Constitutional law ☞26—States have police power over subjects, except as limited by Constitution or surrendered to federal government.**

The state Legislatures are free to exercise the sovereign power of the state, except in so far as restrained by the state Constitution, and for purposes of federal inquiry may be assumed to have the full police power of a sovereign, except in so far as such power has been surrendered to the federal government.

5. **Constitutional law ☞212, 253—Fourteenth Amendment did not restrict police power to matters previously regulated.**

The adoption of Const. U. S. Amend. 14 did not guarantee future freedom of action in all matters in which action had not theretofore been restricted, so as to prevent the application of the police power of the state in matters to which it had not theretofore been applied.

6. **Mines and minerals ☞86—States can fix coal prices.**

The regulation of the coal-mining business is within the police power of a state, and in such regulation the state can fix prices, which is a well-recognized mode of police regulation.

7. **Constitutional law ☞212, 253—State law under police power violates Fourteenth Amendment only when without bearing.**

The test to determine whether a state law passed under its police power violates Const. U. S. Amend. 14 is whether there is no basis of fact on which to support the Legislature's finding of public welfare, or when the remedy prescribed has no possible connection with the evil to be cured.

8. **Injunction ☞11—Relief denied, in absence of actual or threatened injury, notwithstanding possibility of injury.**

A bill to restrain action by a state coal commission will be dismissed, where there is no showing of action or threatened action by the commission which interferes with complainant's rights, even though it is possible that the commission may in the future make orders which will interfere with complainant's rights under the federal Constitution.

In Equity. Suit by the American Coal Mining Company against the Special Coal and Food Commission of Indiana and others. Application for temporary injunction denied, and bill dismissed without prejudice.

Charles Martindale, and Whitcomb & Dowden, all of Indianapolis, Ind., and Cooper, Royse, Bogart & Gambill, of Terre Haute, Ind., for plaintiff.

Ele Stansbury, Atty. Gen., for the State.

James W. Noel and Howard S. Young, both of Indianapolis, Ind., for Special Coal and Food Commission of Indiana and others.

Before BAKER and EVANS, Circuit Judges, and GIEGER, District Judge.

BAKER, Circuit Judge. [1] Respecting the motion for a preliminary injunction, the court is of opinion that certain parts of the bill do not present any emergency. Granting that the plaintiff has the right, under the federal Constitution, to have its outstanding con-

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tracts protected from interference, it would be time enough to consider that question when an actual order is made by the commission, the effect of the enforcement of which would be to impair such contracts. Until that time the question, in our judgment, is purely moot.

Similarly in regard to the question of interference with interstate commerce, no order has been made which directs this or any other mining company to do any specific thing. When some order may hereafter be made by the commission, the plaintiff, instead of finding itself damaged, may possibly find itself benefited. If the commission should direct the plaintiff to produce a maximum of 100,000 tons of coal for Indiana consumption, and the plaintiff should say, "We have already arranged for a larger Indiana consumption," certainly the plaintiff would not be injured by such an order; or, if the commission were to direct the plaintiff to dispose of 100,000 tons to Indiana consumers, at a price of $2.50 per ton, the plaintiff might very gratefully accept the order and say "We had expected to charge only $2.25 a ton."

We will not indulge in any presumption that orders, when they come to be issued, will in fact cause or threaten to cause any material damage to the plaintiff.

[2] The question of the license fees the court would not deem a sufficient basis for the issuance of an injunction pendente lite, because as far as our information of the Indiana law goes, the plaintiff would have an adequate remedy by paying under protest, and bringing an action for the recovery of the amount paid, with interest; and the coal commission statute itself provides that none of the penalties shall be enforced while a civil question is being determined. Even if there should be a threat of enforcement of penal provisions, by reason of a refusal to obey some order of the commission, it would be time enough then to appeal to a court of equity, on the ground that no adequate remedy at law existed, and that there was an impending, actual threat of invasion of rights.

There is involved, however, in this application for a preliminary injunction, the one foundational question of the right of the state to touch, at all, the coal-mining business.

If no such right exists in the state, then the temporary injunction should be issued at once; and because there would be no questions of fact to controvert, a final decree in favor of the plaintiff should at once be entered, if there is a total lack of power in the state to create this commission, through which to undertake the control of coal mining.

[3] Does such a power exist? Of course, it is elementary that our federal government is one of enumerated, specially defined powers, and powers essential to the execution of those specifically granted, and that out state governments are organized on the exact converse of that theory. The state has all the powers of an absolute, unrestrained sovereign, except so far as the state surrendered certain sovereign powers with which to constitute and create the federal government.

[4] The Legislature of the state is the agent of the people of the state in exercising the people's powers as an absolute sovereignty. The Legislature is an absolutely free agent in exercising state powers, except in so far as its principals, the people, have expressed a limitation

in the state Constitution. For the purpose of this federal inquiry it may be taken that the state Legislature had the full power of the people of the state of Indiana, and that the people of Indiana stood as absolute sovereigns over the persons and properties within the limits of the state, except in so far as those powers of sovereignty had been surrendered to the federal government. Among the powers surrendered, of course, was the power over interstate and foreign commerce, treaty making, the war power, and others. But there remained to the people of Indiana, as absolute sovereigns, the whole of the police power over matters within the state. That means the power of the people to determine upon measures for the public welfare, which may be expressed by the Legislature without any limitation that is not imposed upon the state by the federal Constitution.

[5] In this present inquiry concerning the right of the plaintiff to a preliminary injunction, the only federal question presented is that which arises under the Fourteenth Amendment. The Fourteenth Amendment was adopted, according to my present memory, in 1868. In 1868 there was a certain circle within which a person had his life, his right to his physical being. Within that circle he had free movement, and it was not until he came to cross its periphery that he collided either with his fellowmen or with the government as a social organism. And similarly in 1868 there existed circles which circumscribed a person's business and property rights.

Now, did the adoption of the Fourteenth Amendment mean that civilization was arrested at that date? Did it mean that the historian of the year 3000 would look back to the year 1868 as the time of the formation of a crystallized stratum of civilization in which, as in the geological stratum, he might find the footprints of the megatherium and the fossils of the dinosaurus? If that is true, then every attempt since 1868 to narrow the circle within which one was entitled to life has been in violation of the federal Constitution. If that is so, then every statute which created and defined a new crime and provided a punishment for it was unconstitutional. If that is so, then every time a new condition was imposed by which liberty of contract was restricted, and this circle was diminished in its area, the statute creating the condition was unconstitutional. Property is coupled with life and liberty. It is thereby entitled to equal consideration, but certainly to no greater. And therefore a state Legislature was just as free to limit the circle in which property rights stood as it was to diminish the circles in which life and liberty, freedom of contract, freedom of action, were circumscribed.

Of course, all the cases that have upheld any sort of state legislation since 1868, that has in fact diminished one's condition with his fellows and with the state, have necessarily meant that this Fourteenth Amendment did not fix a date line at which civilization should be considered as stratified and embodied in a dead layer.

[6] To my mind there are two classes of cases that illustrate the right of the state to exercise its police power. Over on the one side fall all of the cases in which there is a public franchise, or a public service, or a public utility. Over on that side belong, also, innkeepers

along with the carriers, and to that class was added, in Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77, the warehouse, which had been a private warehouse. In such cases the right to exercise the police power is based upon the fact that they either had a public charter, exercising a public power, like that of eminent domain, or they were performing a public service.

But there are other cases in which none of these elements of a charter, or the power of eminent domain, or a public service, or a devotion of property to public use, appears.

How about the law in Indiana, back in 1881, that forbade a lightning rod expert to sell 40 rods to a farmer, and put them up on his barn, and go in and get the farmer to persuade or coerce his wife into signing as surety? In that case there was no charter, no franchise, no eminent domain, no public service, involved. It was purely an interference with the right of private contract, without the slightest excuse of the kind found over on the other side of the line. And what was the basis of it? The basis was the finding by the Legislature that wrongs and oppressions were being inflicted upon the married women of this state through the persuasion or duress of husbands or sons, and that the condition was of such consequence to the state, as an organized society, that a stop should be put to it; and so the Legislature passed the law (Rev. St. Ind. 1881, § 5119) that any contract of suretyship of a married woman should be void. That act was passed since 1868. If the adoption of the Fourteenth Amendment created a crystallized stratum, so that never thereafter could the right of contract be impaired, then that law was unconstitutional.

How about the laws, in this coal-mining industry, relating to the furnishing of timbers and props, and cages, and ventilation, and the general taking away of the freedom of contract between the mine operators and the miners with respect to the conditions under which they shall work? Under those laws it was no longer permissible for them to barter about what should be done with respect to the conditions in the mines. There was an absolute standard fixed, and the mine operator was absolutely prohibited from doing certain things. Why that law? Because of the dominance of the operator it was found by the Legislature that the men needed protection. The same thing is the basis of all our inspection laws. All of these things that are controlled in that way may be inspected, and the cost of the inspection charged against that particular industry, just as the examination of banks is charged against the banking business.

Those are all familiar restrictions. Thousands of them could be cited, but they are all over on the other side, and there is a clear line dividing them from the cases that are based upon franchises and the exercise of eminent domain, the employment of streets for water and lighting and transportation purposes. These have no basis at all, except upon the power of the people to restrict the theretofore existing circle in which a person had his life, and the one within which he had his liberty, and the one within which he had his property, to bring these down narrower on account of conditions that were found to be oppressive to the people.

Over on this side, where the source of the power is the existence of a franchise, when the evil has been found to be that of exacting more than was fair to exact of the people, there has never been any doubt that the proper remedy was to say that "all you shall obtain shall be a fair return."

Now, what basis is there for any distinction in remedies? There is no distinction as to the source of power of regulation. It all comes from the police power. Dividing that into the two subject-matters upon which the police power operates—the one based upon the public franchise or the like, and the other upon abuses of the theretofore existing right of private contract or private property—when in the one case you find that the evil to be cured is extortion and the remedy is price regulation, then in the other case, when extortion is also found to be the evil, you should apply the known remedy for extortion. The power is one; the evil is the same evil; and the remedy is drawn from the same reservoir, though from different faucets. There is no infringement of the right of a man to hold property, if, under the power of eminent domain, it is taken from him for a public use and the fair value of it is paid him. That is a constitutional thing, and there is no objection to it. So, when it comes to regulating the returns that he shall receive from his property, that is not taking his property; it is simply a control of his property as an instrument in his hand, with which the Legislature has found that he has been bludgeoning the people.

I remember very well reading ancient statutes about cutting off the ears of the wage-earner and putting him in a pillory, if he went from one parish to another without written consent, and about fixing the wages of the laborer, and fixing prices, back in the times of Queen Elizabeth. Those statutes, though long ago repealed, demonstrate that in Anglo-Saxon institutions there was no lack of power to restrict the freedom of contract and to apply to the evil of extortion the remedy of price fixing. But there has been one statute that from the earliest times has stood over on this side of the line purely as an interference with the right of contract, and regulating the price. Take the case of the lender making a loan to a man at usurious interest. Now, what is a loan? A loan is really a sale. Title passes at once. Money is a commodity. Bankers buy and sell money. Now, here is one line of business that never has depended, as a basis for control, upon the power of eminent domain, or a public service. It is a private business. Nothing could be more private than the pawnbroker's business, and yet, from time immemorial, it has been unquestioned that the power existed to regulate that business by fixing the prices for money. I am unable to distinguish the underlying principle in that case from this, or from the statutes regulating rentals. I know, from common knowledge, that the state of New York has had under consideration such a statute, and Wisconsin has passed a law regulating rentals under certain conditions and during certain times; that is, there was a finding by the people of Wisconsin, who were the absolute sovereigns in all respects over every person and every piece of property in that state —except to the extent that sovereignty had been surrendered to the federal government—through their agent, the Legislature, that extor-

tion was being practiced by landlords. The Legislature was the unrestricted agent of the people; it had the full power of the people, just as much so as if the people got together in a new constitutional convention and found exactly the same quality of oppression that was exercised by the man who took advantage of the necessity of some one to get some currency for himself. Are the sovereign people helpless in such a situation? They certainly are, if the Fourteenth Amendment stopped the narrowing of these various circles within which persons theretofore might move freely with respect to life, liberty, and property. But, otherwise, not. The police power is continuous. It has always existed, and necessarily must always exist. And it is as wide as any conceivable sovereignty can be. It is absolutely as wide—laying aside for the moment the part of the absolute sovereignty that has been made over to the federal government—as that of the Arab sheik, sitting out in front of his tent, controlling the actions of his tribal members.

Such is the power of the people of the state, provided they preserve a republican form of government and do not otherwise infringe upon the federal Constitution.

One of the powers that was surrendered by the state was the war power. But the state never surrendered a jot or tittle of the police power as affecting the affairs within the state. Of course, they surrendered their police power as involving war. That has gone to the federal government. The power over interstate and foreign commerce has all gone to the federal government. With respect to internal affairs the power stands absolutely unchanged, unrestricted, in the state.

The federal government, being a government of listed, delegated powers, never had any general totality of sovereignty, as the states originally had. The federal government has no sovereignty, except that which was cut off from the states and welded together to make what there is of the national sovereignty. The federal government has no general police power, but with respect to war it is the successor of the state in police power—the power of the state to protect itself, the power to determine its own necessities, the power to protect the health and welfare and morals of its people. No dispute has ever arisen when health and morals were concerned. When you get down to welfare, the question is frequently raised about financial considerations. But, of course, the state has a right to protect its people with respect to financial considerations. All of our blue sky laws, and our married women surety laws, and our laws restricting the sale of patent rights, and our laws controlling fire insurance rates, and our exemption laws, are all financial questions, looking to the welfare of the citizens of the state, and ultimately the welfare of the state, because the state has an interest in the welfare of all of its citizens and inhabitants.

The federal government, with respect to the war power, is simply the successor of a part of what was once the state police power. The national power, with respect to war, is simply a piece cut off of the general power that belonged to the original states, which might have kept up, if they had chosen, each for itself, an absolute, full sovereignty.

Now, under that war power, which, in the national scheme of gov-

ernment, stands exactly analogous to the police power of the state, what has been done? Of course, the war power has been interpreted, and had to be interpreted, in view of the restrictions in the federal Constitution; had to be construed with respect to what was reserved in the federal Bill of Rights—the first ten amendments, and particularly the Fifth Amendment.

We have never thought, for a moment, that this war power authorized the federal government to go out and take a man's property without compensation. No. The Food Administration did not appropriate a man's property without due compensation. The Fuel Administration did not propose to take his coal away from him without due compensation. The federal government has this war power, originally the police power of the state, and it would have all been in our state, fully and completely, if it had not been assigned to the federal government, and when assigned its character did not change a particle; but it remained the police power, and under that police power, interpreted with the other provisions of the federal Constitution, you cannot take a man's property from him; but the Congress has declared, and, so far as the courts have passed upon it, they have said that, under that assigned part of the state police power, the right did exist to regulate conditions of handling, and the prices of food and fuel. If the police power stops, it will stop when and where civilization and human rights stop, and not before. These questions are questions for each generation—each generation of free men; it ought to be so, and under the law it is so.

[7] Now, is there any rule for determining when the federal courts shall interfere, under the Fourteenth Amendment, with a state statute enacted under the police power? Yes. The best analogy, to my mind, is the basis on which an appellate court interferes with the verdict of a jury. If there is no basis on which a reasonable man could arrive at the result, it is set aside. Otherwise, it is not, even though the court, sitting as a jury, might have found the facts the other way.

It is only when either no basis of fact exists on which to lay the Legislature's finding, or when the remedy prescribed by the Legislature has no possible relevant bearing or connection with the evil to be cured, that the statute is set aside.

As an illustration of that last feature, let us assume that the city of Indianapolis has passed an ordinance regulating the sale of fruit by retailers, which provides that the fruit shall be protected from flies and dirt by keeping proper netting over it, even prescribing the size of the openings in the netting. I assume that nobody would dispute that that was a reasonable exercise of the police power, to protect the health of the people. But suppose the council, finding the same evil existing among these vendors, not very cleanly, and not acquainted with the germ theories regarding the spread of diseases through the excretions of insects, should prescribe as a remedy that these fruit vendors should wear red plug hats? Of course, that ordinance would fall as an unreasonable, arbitrary, whimsical exercise of the police power, because, so far as we are now informed, there is no reasonable connection between the evil to be cured and the way in which the city

council said it should be cured. But, as we have heretofore indicated, control of prices is known of old as a remedy for extortion.

This leads to the conclusion that all aspects of this bill are premature, except this one on the general power of the state. We are satisfied that the general power of the state to touch, in some way, upon the coal-mining industry, exists. If by actual orders, the state of Indiana, through its coal commission, should make a requirement upon some particular coal operator, that, instead of being favorable to his interests, as the supposititious order that I stated a while ago, was deemed by him to be detrimental to his interests—detrimental by reason of a conflict between the order and the rights guaranteed to him by the federal Constitution—then he would have a right to complain. That would be the time to determine whether the particular order did, in fact, infringe some right of the plaintiff—not theoretically, but in a way to inflict a trespass, an actual impending trespass, upon his property rights. The question about contracts, about violations and impairments of existing contract rights, could be raised at such a time. That is all purely speculative and conjectural now. And it is also purely speculative and hypothetical, even now, to inquire whether the plaintiff in such a case would have a sufficient legal remedy in the circuit court of Marion county, or whether he would be entitled to the prompt intervention of the federal court.

[8] This discussion of the one underlying principle involved in the hearing of this motion for the preliminary injunction also goes to the heart of the motion to dismiss. That is, there is in this bill—speaking now for myself, on the motion to dismiss, which is before the District Court—there is no basis in fact for injunctive relief, except this one of want of power. The power existing, that ground disappears from the bill, and the other grounds present theories of what might happen and not allegations of fact respecting an existing situation—except as to those items of the $25 and the license tax of 1 cent a ton.

The order will be that the application for a temporary injunction is denied, and on the motion to dismiss the order will be that the bill is dismissed without prejudice. That means that there is absolutely nothing in the bill, now, in our judgment, that warrants either a temporary injunction or a final injunction. You cannot make any proof as to a hypothetical condition in the future.

The bill will be dismissed without prejudice, and the record may show affirmatively that there is absolutely nothing decided, except the one question, that the state, under its police power, can lay its hand upon the coal-mining industry. There may be, to-day, wholly private businesses that we would have no hesitancy, to-day, in saying were beyond the reach of the Legislature—saying so, just as we would say in case of a verdict of a jury, because there is no basis of fact upon which to predicate such a finding; but our sons, or our grandsons, may find a very urgent necessity for including that class of business, or enterprises, within the regulation of the state, under its police power.

My Brethren graciously state that they concur in the views that I have endeavored to express for all of us.