## WORK, SECRETARY OF THE INTERIOR, *v.* LOUISIANA.

APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 5. Argued October 6, 1925.—Decided November 23, 1925.

1. A suit by a State to restrain the Secretary of the Interior from rejecting the State's claim under the Swamp Land Acts upon an unauthorized ruling of law illegally requiring the State, as a condition precedent, to show that the lands are not mineral in character, is not objectionable as being premature and as invading the Secretary's function to adjudicate the title. P. 254.
2. In such a suit, the United States, and homestead entrymen claiming the lands, are not indispensable parties defendant. *Id.*
3. The grants of the Swamp Land Acts of 1849 and 1850, were *in praesenti*, and gave the grantee States an inchoate title that became perfect, as of the dates of the Acts, when the granted lands had been identified as required and the legal title had passed by approval of the Secretary under the Act of 1849 or the issuing of a patent under the Act of 1850. P. 255.
4. Neither of these acts contains any exception or reservation of mineral lands and none is to be implied, since at the time of their enactment the public policy of withholding mineral lands for disposition only under laws specially including them, was not established. *Id.*
5. The Secretary of the Interior can not be required by injunction to recognize a State's title under the Swamp Land Acts when he has not as yet determined whether the lands claimed were " swamp or overflowed." P. 260.

53 App. D. C. 22, 287 Fed. 999, modified and affirmed.

APPEAL from a decree of the Court of Appeals of the District of Columbia affirming an injunction awarded by the Supreme Court of the District of Columbia against the Secretary of the Interior.

*Mr. H. L. Underwood,* Special Assistant to the Attorney General, with whom *Solicitor General Beck* and *Assistant Attorney General Wells* were on the brief, for appellant.

*Mr. S. L. Herold,* with whom *Messrs. Percy Saint,* Attorney General of Louisiana, and *F. W. Clements* were on the brief, for appellee.

MR. JUSTICE SANFORD delivered the opinion of the Court.

This is a suit in equity brought by the State of Louisiana against the Secretary of the Interior in the Supreme Court of the District of Columbia, seeking a restraining order and mandatory injunction relating to its prosecution of a swamp land claim under the Acts of March 2, 1849, c. 87, 9 Stat. 352, and September 28, 1850, c. 84, 9 Stat. 519. A motion by the Secretary to dismiss the bill was overruled; and upon his election to plead no further, a decree was entered awarding an injunction. This was affirmed by the Court of Appeals of the District. *Fall* v. *Louisiana,* 287 Fed. 999.[1] This appeal was allowed in April, 1923.

By the Act of 1849, there was " granted " to the State of Louisiana, to aid it in the reclamation of the swamp and overflowed lands therein, " the whole of those swamp and overflowed lands,[2] which may be or are found unfit for cultivation "; and it was provided that, upon the request of the Governor, the Secretary of the Treasury [afterwards the Secretary of the Interior[3]] should cause an examination of all such lands to be made by deputies of the surveyor-general; " a list of the same to be made out, and certified by the deputies and surveyor-general to the Secretary . . . , who shall approve the same, so far as they are not claimed or held by individuals; and on that approval, the fee simple to said lands shall vest in 'the said State."

---

[1] In the Court of Appeals the present appellant was substituted for his predecessor against whom the suit had been brought.

[2] Except those fronting on rivers, etc., previously surveyed under an Act of 1824.

[3] Act of March 3, 1849, c. 108, 9 Stat. 395, creating the Department of the Interior.

By the Act of 1850 there was " granted " to the State of Arkansas, for a like purpose, " the whole of those swamp and overflowed lands, made unfit thereby for cultivation," which then remained unsold; and it was provided that the Secretary of the Interior should make out and transmit to the Governor accurate lists and plats of such lands " and at the request of said governor, cause a patent to be issued to the State therefor; and on that patent the fee simple to said lands shall vest in the said State." It was further provided that " the provisions of this Act be extended to, and their benefits conferred upon, each of the other States of the Union in which such swamp and overflowed lands . . . may be situated." The general provisions of this Act were carried into § 2479, *et seq.*, of the Revised Statutes.

We assume, without deciding, that, in accordance with the practice of the Land Department, the claims of Louisiana to the swamp and overflowed lands may be allowed under either the special Act of 1849 or the general Act of 1850. See *Louisiana* v. *Garfield*, 211 U. S. 70, 76; *Cross Lake Club* v. *Louisiana*, 224 U. S. 632, 635.

The material facts shown by the bill and exhibits are: The lands in question, with others, were surveyed in 1871 by a deputy surveyor. They were identified and returned as swamp and overflowed lands by his plat of survey, which was filed and approved by the Surveyor General. At that time they were not known to contain minerals of any character. In 1901 the register of the state land office requested that they be listed and approved to the State as swamp lands. Various homestead entries were thereafter made in the local Land Office; some, if not all, of which were allowed, subject to the swamp land claim of the State. In 1910 they were included in a Petroleum Withdrawal made by a Presidential order under the Pickett Act.[4] Finally, in 1919, after

_____

[4] Act of June 25, 1910, c. 421, 36 Stat. 847.

various intermediate proceedings, the Commissioner of
the General Land Office, in an administrative decision,
" found from the field notes of the survey of 1871 that the
lands . . . are swamp or overflowed, and, *if nonmineral
in character,* inure to the State under its grant, and may
be patented pursuant thereto when the record has been
cleared of adverse claims." And he thereupon ruled that
unless the State should, within a specified time, apply
for a hearing—in which the homestead entrymen might
participate—and show that the lands were non-oil and
non-gas in character, its claim would be rejected and the
lands held for disposition under the public land laws, On
an appeal by the State, the Secretary affirmed this deci-
sion; and he later denied a motion by the State for a re-
hearing, the grounds of his decision being that mineral
lands did not inure to the State under the swamp land
grants; that the mineral character of land claimed as
swamp and overflowed was open to investigation until the
inchoate title of the State had been perfected by the Sec-
retary's approval under the Act of 1849 or the issue of a
patent under the Act of 1850; that these lands had been
impressed with a *prima facie* mineral character by the
petroleum withdrawal; and that the State had been ac-
corded due opportunity to show that they were not min-
eral bearing, failing in which its claim must stand re-
jected. 48 Land Dec. 201, 203.

The bill, which was then filed, alleged that the Secretary
had exceeded his authority and jurisdiction in making the
unlawful requirement imposing upon the State the burden
of showing that the lands had no minerals and denying
its right to them because it had not undertaken to dis-
charge the burden thus illegally put upon it; and prayed
that he be enjoined from taking further action in enforce-
ment of this ruling and be required to vacate and set it
aside.

1. It is urged that the trial court was without jurisdic-
tion to entertain the bill, upon the grounds that it was

prematurely brought, before the Secretary had exercised his jurisdiction to determine the character of the lands and while the claim was still in the process of administration; and that both the United States and the homestead entrymen were necessary and indispensable parties. These objections are based upon a misconception of the purpose of the suit. It is not one to establish the title of the State, as in *Louisiana* v. *Garfield, supra,* and *New Mexico* v. *Lane,* 243 U. S. 52, nor one to quiet its title, as in *Minnesota* v. *Lane,* 247 U. S. 243. The bill does not seek an adjudication that the lands were swamp and overflowed lands or to restrain the Secretary from hearing and determining this question, but merely seeks an adjudication of the right of the State to have this question determined without reference to their mineral character, and to require the Secretary to set aside the order requiring it to establish their non-mineral character or suffer the rejection of its claim. In short, it is merely a suit to restrain the Secretary from rejecting its claim, independently of the merits otherwise, upon an unauthorized ruling of law illegally requiring it, as a condition precedent, to show that the lands are not mineral in character.

It is clear that if this order exceeds the authority conferred upon the Secretary by law and is an illegal act done under color of his office, he may be enjoined from carrying it into effect. *Noble* v. *Union River Railroad,* 147 U. S. 165, 171, 172; *Garfield* v. *Goldsby,* 211 U. S. 249, 261, 262; *Lane* v. *Watts,* 234 U. S. 525, 540; *Payne* v. *Central Pacific Railway,* 255 U. S. 228, 238; *Santa Fe Pacific Railroad* v. *Fall,* 259 U. S. 197, 199; *Colorado* v. *Toll,* 268 U. S. 228, 230. A suit for such purposes is not one against the United States, even though it still retains the legal title to the lands, and it is not an indispensable party. *Garfield* v. *Goldsby, supra,* pp. 260, 262; *Lane* v. *Watts, supra,* p. 540. Neither are the homestead entrymen indispensable parties. *Lane* v. *Watts, supra,* pp. 537, 540.

In this latter respect the cases of *Litchfield* v. *Register*, 9 Wall. 575, in which it was sought to enjoin the Department from acting upon pending applications to prove preëmption rights to the land, *New Mexico* v. *Lane, supra,* in which it was sought to set aside an entry made by one who had purchased and paid for the land and to enjoin the issuing of a patent to him, and *Brady* v. *Work,* 263 U. S. 435, in which it was sought to enjoin the issuing of a patent to a person to whom the Department had adjudged the right to the land, are clearly distinguishable.

2. This brings us, on the merits, to the consideration of the question whether the order exceeded the authority conferred upon the Secretary, and attached to the prosecution of the claim of the State, without warrant of law, the condition that it must show that the lands are not mineral in character.

The grants of swamp lands made by the Acts of 1849 and 1850 were *in praesenti* and gave the States an inchoate title to such lands that became perfect, as of the dates of the Acts, when they had been identified as required and the legal title had passed by the approval of the Secretary under the Act of 1849 or the issuing of a patent under the Act of 1850. This has long been the settled construction of the Act of 1850. *Rogers Locomotive Works* v. *Emigrant Co.,* 164 U. S. 559, 570; *Little* v. *Williams,* 231 U. S. 335, 339.

Each of these Acts made a broad and unrestricted grant of the swamp lands. Neither contained any exception or reservation of mineral lands.

It is urged that such a reservation should be read into the grants by reason of a settled policy of the United States of withholding mineral lands from disposal save under laws specially including them. There was, however, no such settled policy in 1849 and 1850 when the swamp land grants were made. Prior to that time, it is

true, it had been the policy in providing for the sale of the public lands, to reserve lands containing "lead mines" and "salt springs." *United States* v. *Gratiot*, 14 Pet. 526, 538; *United States* v. *Gear*, 3 How. 120, 131; and *Morton* v. *Nebraska*, 21 Wall. 660, 668. Such mines and springs appeared upon the surface of the land, and were peculiarly essential to the public needs of the early communities. But there was, at that time, no established public policy of reserving mineral lands generally. This is emphasized by the fact that the general Act of 1841,[5] which gave preëmption rights to settlers on the public lands, merely excepted lands "on which are situated any *known salines or mines.*" And while the Act of September 27, 1850,[6] providing for the disposal of public lands in the Territory of Oregon to settlers, expressly excepted "mineral lands," it is manifest that this one local Act, approved the day before the swamp land Act of 1850, was insufficient to establish a settled public policy in reference to the reservation of mineral lands prior to the latter Act. And the fact that immediately after the subject of mineral lands had been thus brought to the attention of Congress, it did not except mineral lands from the grant of swamp lands to the several States, indicates that no reservation of such lands was intended.

It is clear that, as there was no settled public policy in reference to the reservation of mineral lands prior to the acts of 1849 and 1850, there is no substantial ground for reading such a reservation into the broad and unrestricted grants of swamp and overflowed lands made to the States, *in praesenti*, by these Acts, especially since such lands were not then generally known to contain valuable minerals, and when unfit for cultivation were commonly regarded as having value only after reclamation—the purpose for which both of these grants were made—the

---

[5] Act of September 4, 1841, c. 16, 5 Stat. 453.

[6] 9 Stat. 496, c. 76.

discovery of their oil and gas having been made at a much later date.

This conclusion, even apart from the peculiar character of swamp and overflowed lands, is fortified by the decision in *Cooper* v. *Roberts,* 18 How. 173, 179, 180, in which it was held that a provision in the Michigan Enabling Act of 1836,[7] that certain sections of the public land should be granted to the State for the use of schools, became a legal title to such sections when they were surveyed and marked out; and that, no statute prior to the Enabling Act having contained any reservation of mineral lands other than those containing salt springs or lead mines, the later Act of 1847 [8] providing for the sale of the mineral lands in the State should be construed as not withdrawing such lands within the school sections from the compact with the State.

The same conclusion was also reached in an unreported opinion given by the Acting Attorney General (the then Solicitor General) to the Secretary of the Interior in September, 1916, in which, citing *Cooper* v. *Roberts* in support of his views, he said: " There was no exception of mineral land from the swamp land grant made to the State of Louisiana and prior to that time . . . the only reservation of minerals made by the Federal Government in any of its legislation affecting the public lands related to lands containing salt springs, lead mines and contiguous tracts. The policy of reserving minerals generally was not established until after the swamp land grant was made to Louisiana."

This conclusion is not in conflict with the later decisions relating to school lands in *Mining Co.* v. *Consolidated Mining Co.,* 102 U. S. 167—followed in *Mullan* v. *United States,* 118 U. S. 271— and *United States* v. *Sweet,* 245 U. S. 563. In the *Mining Co. Case,* in which it was

---

[7] Act of June 23, 1836, c. 121, 5 Stat. 59.

[8] Act of March 1, 1847, c. 32, 9 Stat. 146.

held that a provision in the Act of 1853 [9] for the sale of
public lands in California, granting certain sections to the
State for school purposes, was not intended to cover
mineral lands, the decision was not based upon the
ground that there was at that time any settled and
general policy of reserving mineral lands, but, on the
contrary, on the ground that the discovery in 1849
that California was rich in precious metals, bring-
ing its mineral lands to the attention of Congress, had led
to the adoption in reference to that State of a local policy,
plainly manifested in other provisions of the Act making
specific exceptions of mineral lands, by which, unlike the
ordinary laws for disposing of public lands in agricultural
States, the mineral lands in that State were uniformly
reserved from sale, preëmption and grants for public pur-
poses (pp. 172–175). In the *Sweet Case* it was held that
the provision of the Utah Enabling Act of 1894,[10] granting
to the State certain sections of the public lands for the
support of common schools, with no mention of mineral
lands, was not intended to embrace land known to be
valuable for coal. The grounds of this decision were that
long prior to the Act there had been established a settled
policy in respect of mineral lands, evidenced by the mining
laws and other statutes, by which they were withheld from
disposal save under laws especially including them; and
that read in the light of such laws and settled public
policy the Act did not disclose a purpose to include such
lands in the school grant, since, although couched in gen-
eral terms adequate to embrace them if there were no
statute or settled policy to the contrary, it contained no
language explicitly withdrawing the school sections, where
known to be mineral in character, from the operation of
the mining laws, or certainly showing that Congress in-
tended to depart from its long prevailing policy of dispos-

[9] Act of March 3, 1853, c. 145, 10 Stat. 244.
[10] Act of July 16, 1894, c. 138, 28 Stat. 107.

ing of mineral lands only under laws specially including them: this conclusion being fortified by the further considerations, that, when the grant was made, Utah was known to be rich in minerals and salines; that, while some of the other grants contained in the Act expressly included saline lands, none included mineral lands; that the Committees of Congress, upon whose recommendation the Act was passed, construed it as not embracing mineral lands; that the Land Department had uniformly placed the same construction upon it; and that Congress had, by a later act of 1902, acted upon that construction (pp. 567, 572, 573). Obviously, this decision does not apply to the construction of the swamp land grants made at a time when there was no settled policy as to the reservation of mineral lands, and where the other circumstances upon which the decision was based are lacking.

There is here no such uniform and long settled departmental construction of the swamp land Acts. It is not claimed that the Land Department construed them as excluding mineral lands or considered the question of the mineral character of swamp lands until quite recently. As late as October 1, 1903, the Secretary instructed the Commissioner that all pending selections under the swamp land grants to the State of Louisiana would be approved or patented to the State under the grants of 1849 or 1850, in all cases where the lands were shown by the field notes of survey or by affidavits filed at the time of selection, to have been swamp lands at the date of the grant. 32 Land Dec. 270, 276, 278. The first holding by the Department that mineral lands did not pass under the swamp land grants appears to have been made in 1917, more than sixty years after the passage of the Acts, in an unreported ruling.[11] This was followed by like departmental decisions in 1918, 46 Land Dec. 92, and 46 Land Dec. 389, 396—in

---

[11] Cited in 46 Land Dec. 389, 396.

which the contrary view expressed by the Attorney General was put aside as being *obiter*—and in 1920, 47 Land Dec. 366, shortly before the decision involved in the present case. We cannot regard these recent decisions of the Department—apparently departing from its previous well established practice, and rendered, except in one instance, in connection with the long delayed adjustment of the claims of Louisiana—as establishing a settled and uniform course of departmental construction that is persuasive as an aid in the construction of the Acts.

We conclude that the swamp land Acts granted to the States the swamp and overflowed lands, rendered unfit for cultivation, without reference to their mineral character; and that in requiring the State to establish the non-mineral character of the lands in question the Secretary exceeded the authority conferred upon him by the Acts and attached this condition to the prosecution of the claim of the State without warrant of law.

3. A question remains as to the effect of the decree awarding the injunction. This, after commanding the Secretary to vacate the ruling operating to withhold title from the State for any reason dependent upon the mineral character of the lands or to require that their non-mineral character be shown, contained the following supplemental clause: " and further restraining him, and them [12] from making any disposition of said described lands or from taking any action affecting the same save such immediate steps as are necessary to the further and final recognition of plaintiff's rights under the acts of March 2, 1849 (9 Stat. 352) and September 28, 1850 (9 Stat. 519), to the end that evidence of title may be given to plaintiff as by said acts provided and required." If, as urged, the effect of this supplemental clause is to divest the United States of title to the lands and leave the Secretary to do nothing

---

[12] His successors and agents.

but furnish the State evidence of title in final recognition of its asserted rights, the decree in this respect is plainly erroneous, aside from any question as to the scope of the bill or the necessary presence of the United States as a party. The State has not as yet finally established its right to the lands, and the administrative processes necessary thereto are not complete. The Secretary, it appears, has not as yet determined that they were swamp and overflowed lands. The finding of the Commissioner that they were "swamp or overflowed" was not brought in question before the Secretary, and his decision involved no approval of such finding, but related merely to the ruling of the Commissioner requiring the State, independently of this finding, to establish the non-mineral character of the lands. The Secretary, in the exercise of the administrative duty imposed upon him, is necessarily required, before furnishing evidence of title under either of the Acts, to determine whether the lands claimed were in fact swamp lands; and he may not be restrained from investigating and determining this in any appropriate manner.

The decree is inartificially framed. We think that the supplemental clause which we have quoted, in effect requires the Secretary to recognize that the State has already established its right to the lands and to do nothing further in reference to them except to furnish it evidence of title in final recognition of such established right, and restrains him from investigating and determining, without reference to the mineral character of the lands, whether they were in fact swamp and overflowed lands, before giving final recognition to such right as the State may establish under either of the Acts and issuing to it any evidence of title. The decree is accordingly modified by striking out this supplemental clause. Thus modified it should stand.

*Decree modified and affirmed.*