HORACE HAVEMEYER ET AL., Plaintiffs and Appellants, v. PUB-
LIC SERVICE COMMISSION OF PUERTO RICO ET AL., Defendants
and Appellees.*

No. 5401. Argued March 30, 1932.—Decided November 9, 1933.

O. B. Frazer and R. Castro Fernández for appellants. A. Ortiz Toro,
Acting Attorney General, and M. Rodríguez Serra, Assistant At-
torney General, for appellees.

* NOTE.—On appeal to the U. S. Circuit Court of Appeals for the First Circuit, this
decision was reversed and the case remanded. See 74 F. (2d) 637.

MR. JUSTICE ALDREY delivered the opinion of the Court.

The civil agricultural partnership Russell & Company, Sucrs., *S. en C.,* by its partners Horace Havemeyer and others, as grantee of certain rights which the Guánica Land Company had in a franchise, appealed to the District Court of San Juan from a decree of the Public Service Commission of Puerto Rico canceling the said franchise, in so far as it referred to the right of taking a certain amount of water from Guánica Lake. The district court affirmed this decree of the commission and dismissed the appeal taken therefrom. Russell & Company appealed from that judgment to this court. The partnership based its appeal to the district court on section 78 of Act No. 70 of 1917, the short title of which is "The Public Service Act of Porto Rico"; its appeal to this court being based on section 90 of said law.

The above cited law provides that the District Court of San Juan, to which exclusive jurisdiction is granted, shall decide such appeals upon the record certified to it by the commission; that the question to be determined is whether or not the order appealed from is reasonable, in conformity with the law and based on competent evidence; that in all such cases the orders of the commission shall be prima facie evidence of the reasonableness thereof; that the burden of proving the contrary shall be upon the appellant or appellants, and that if the court shall upon the record find that the order appealed from is reasonable and in conformity with law, it shall enter a decree dismissing the appeal and affirming the order of the commission.

From a certified copy of the record of the commission which was presented to the district court and is now before us, the following appears:

The Executive Council of Puerto Rico granted in 1901 to the corporation Guánica Land Conmpany, and to its grantees, franchise number 5, whereby it was authorized to construct a private railway over public lands and a wharf in the port

of Guánica, and to use twenty million gallons of water daily from Guánica Lake for the proper irrigation of the lands owned or leased by it. We quote some of the clauses of this franchise, to wit:

"1. That the Guánica Land Company, (a corporation organized and existing under and by virtue of the laws of the State of New Jersey), and its successors and assigns be and they are hereby authorized and empowered to erect, construct, maintain and operate a dam of masonry work or other proper materials across the Caño Negro, or outlet from the Lake of Guánica, in the Municipality of Yauco and upon such lands of abutting owners as may have been acquired by consent or by process of law, for the purpose of retaining, storing, and conserving the waters of the said Lake of Guánica, and of restraining and regulating the flow of the water from said Lake, through the said Caño or otherwise, for the purposes hereinafter set forth.

"2. That the said Company and its successors and assigns be and they are hereby authorized to take from the said Lake of Guánica, or from the said Caño or outlet, such quantity of water, not exceeding 20,000,000 gallons during each day, as shall be necessary or sufficient for the proper irrigation of the lands now or hereafter owned or leased by the said company, or by its successors or assigns, or any of them. The water so to be taken from the said Lake or Caño may be taken from such part or parts thereof, adjacent or contiguous to said lands, as the said Company or its successors or assigns may see fit, and may be taken by gravity through proper channels, or by pumps, or by any other method that may be advisable, or by any two or more of such methods.

"3. That the said company and its successors and assigns may erect, construct, operate and maintain upon those parts of the lands now or hereafter owned or leased by it or them, which lie within six meters of the bank of the said Caño, or within twenty meters of the shore of the said Lake or of the harbor or bay of Guánica, such pumping station, channels and pipe lines as may be necessary or proper for the taking or conveyance of said waters; Provided that no public road lying within or partly within said limits shall be obstructed to any extent whatever thereby.

"4. That nothing herein contained shall be held or construed to authorize or permit the said Company or its successors or assigns to raise or maintain the level of the waters of said lake of Guánica above the customary level thereof during the rainy season, as the

same exists in years of average and usual rainfall; and all damage sustained by abutting owners by reason of unduly raising the level of the waters of said Lake, shall be borne by the said Company, its successors and assigns and action for damages shall lie against said company, its successors and assigns for such damage by such abutting owners, in any court of competent jurisdiction.''

Twenty-seven years after said franchise was granted, the Municipal Assembly of Lajas adopted a resolution whereby it complained before the Public Service Commission and before the Commissioner of the Interior that the engineering work carried on in Caño Negro of Guánica Lake are causing irreparable injury to the Municipality of Lajas by throwing the waters of Guánica Lake beyond its highest level, by flooding municipal roads, and by making the life of abutting neighbors and landowners in the wards of Costa and Plata impossible. In view of this complaint and after a certain investigation was made by the president of the commission, the latter ordered that the holders of said franchise appear before the commission to show cause why the same should not be canceled. The civil agricultural partnership Russell & Company appeared by its members Horace Havemeyer and others, as sole owners, by purchase, of that part of the franchise which refers to the use of the waters of Guánica Lake, objected to its cancellation or modification and alleged also that the commission lacked jurisdiction to cancel or modify the said franchise.

It appears, moreover, that Guánica Lake had a pond known as "Negro" or "Los Negros", 3,900 meters or 12,792 feet long, which connects it with the sea; that in 1928 this pond was entirely shut off for a length of three hundred meters, beginning from the lake, and that the remainder of the pond up to the sea was perfectly visible; that the bottom of the lake is higher than the level of the high tides of the sea; that there is in the valley of Lajas a place known as "El Anegado", the bottom of which is higher than that of the lake, and that there exists between El Anegado and the

lake, which are two distinct bodies, a pond which connects them, known as "Angostura" or "Carril"; that El Anegado had been flooded several times prior to 1926 but had dried a few months later; that since the middle of 1926 and during the years 1927 and 1928, El Anegado has been flooded and has formed a single body with the lake; that about four or five thousand acres of land and many private properties of considerable area are under water, some of them being absolutely flooded and others almost totally; that from and after the year 1926 two municipal roads have been under water for about seven or eight kilometers; that diseases have increased in that region; that in the margins of Loco River, which flows into the lake near Negro Pond, works have been done to avoid its drainage; that the government, the grantee or its successors have never determined what the ordinary level of the lake is; that while Negro or Los Negros Pond is open El Anegado may be readily drained, and that water would still remain in the lake by reason of the difference in level existing between them, and that owing to the damages suffered by landowners, the holder of the franchise has granted the usufruct of certain properties to the landowners whose properties have been flooded.

When the commission canceled the franchise on March 8, 1929, it ordered that the decree should become definitely effective on June 30th of that year, and that in the meantime the parties in interest could be permitted to file any further petition they deemed proper for the use of the waters of Guánica Lake, by submitting to the commission specific data as to the highest level of the waters of Guánica Lake, as well as the draft of any works, in order that said level might be permanently kept.

The claim of Russell & Company that the commission lacks jurisdiction to cancel or modify the franchise was raised by the corporation South Porto Rico Sugar Company before the United States District Court for the District of Puerto

682

Rico, when in an injunction proceeding it prayed that the said commission be restrained from interfering in the case. The injunction sought was denied, and on appeal the United States Circuit Court of Appeals for the First Circuit said:

"On May 28, 1928, the Public Service Commission of Porto Rico issued to appellants an order of notice to appear on June 4, 1928, and show cause why said commission should not cancel a franchise granted, on March 19, 1901, to appellants' predecessor in title, by the Executive Council of Porto Rico, to use daily 20,000,000 gallons of the waters of Lake Guánica for irrigation, for the construction and operation of a private railroad to run in part over lands subject to public rights, and to construct and maintain a dock on the Bay of Guánica. Without appearing before the commission, the appellants filed on June 2, 1928, a bill in equity seeking an injunction to restrain the commission from interfering in any way with the enjoyment of their powers under this franchise, and from asserting any jurisdiction over the appellants in respect to said franchise. The court below sustained a motion to dismiss filed by the Attorney General of Porto Rico, holding, in a well-reasoned and cogent opinion, both that the suit was premature and that the Public Service Commission had jurisdiction. This decision was right on both points.

"Courts have no general supervisory power over such tribunals as public service commissions. Judicial interference, apart from express statutory delegation, must be grounded on illegal encroachment upon the property rights. *American Coal Mining Co.* v. *Special Coal & Food Commission* (D.C.) 268 F. 563; *Sayers* v. *Montpelier Wells River R. R.*, 90 Vt. 201, 97 A. 660, Ann. Cas. 1918B, 1050.

"If we assume for the moment that this Public Service Commission has no jurisdiction, the issuance of an order of notice was no such assertion of authority or threat of irreparable injury as to warrant injunctive interference by the court. It would not follow that, on appearance and argument, the commission would adhere to an erroneous view as to the nature and extent of its jurisdiction. The appellants' case in that regard is not supported by the cases relied upon by their learned counsel. *Philadelphia Co.* v. *Stimson*, 223 U. S. 605, 32 S. Ct. 340, 56 L. Ed. 570, and cases cited; *Work* v. *Louisiana*, 269 U. S. 250, 46 S. Ct. 92, 70 L. Ed. 259; *Gallardo* v. *Porto Rico Light & Power Co.* (C. C. A.) 18 F. (2d) 918; *Benedicto* v. *West India & Panama Tel. Co.* (C. C. A.) 256 F. 417.

"Affirmation of the decree below (dismissing the bill) would doubtless be warranted on this ground alone. But it is plainly in

the interest of the parties that we deal now, rather than possibly in a later suit, with the fundamental question of the jurisdiction of the commission to maintain proceedings looking to the repeal, alteration or modification of the appellants' franchise.

"Under the first Organic Act of Porto Rico—the Foraker Act of April 12, 1900, 31 Stat. 77 (48 U S C A Section 731 et seq.)— Congress provided for this recently acquired possession a legislative assembly, consisting of an elective lower chamber, and, in lieu of a senate, an Executive Council, consisting of six heads of the executive departments, appointed by the President. At the end of section 31 it was enacted:

" 'Provided, however, that all laws enacted by the legislative assembly shall be reported to the Congress of the United States, which hereby reserves the power and authority, if deemed advisable, to annul the same.'

"Section 32 reads:

" 'That the legislative authority herein provided shall extend to all matters of a legislative character not locally inapplicable, including power to . . . repeal any and all laws and ordinances of every character now in force in Porto Rico, or any municipality or district thereof, not inconsistent with the provisions hereof; Provided, however, that all grants of franchises, rights, and privileges or concessions of a public or quasi public nature shall be made by the executive council, with the approval of the Governor, and all franchises granted in Porto Rico shall be reported to Congress, which hereby reserves the power to annul or modify the same.'

"Franchises and laws were both thus required to be reported to Congress, which reserved power to annul either or both.

"Under the joint resolution of May 1, 1900, 31 Stat. 715, amending the Foraker Act of April 12, 1900, it was provided:

" 'That all franchises, privileges or concessions granted under section 32 of said act shall provide that the same shall be subject to amendment, alteration or repeal.'

"This was the familiar provision intended to meet the doctrine of the Dartmouth College Case. Pursuant to these powers, the Executive Council the next year (1901) granted the franchise in question, providing in article XVIII 'that the franchises, privileges and concessions hereby granted shall be subject to amendment, alteration or repeal.'

"The same general power to annul laws enacted by the Legislature of Porto Rico is retained in section 34 of the second Organic Act—the Jones Act of March 2, 1917, 39 Stat. 951. 48 U S C A Sect.

822 et seq. In thus reserving in both Organic Acts power to annul laws enacted and franchises granted by the Porto Rican government, Congress acted in close analogy to its long-continued practice with relation to territories within the boundaries of the present United States—respectively states. Compare the Organic Act of Oregon, 9 Stat. 323, Sect. 6; of Minnesota, 9 Stat. 403; of New Mexico, 9 Stat. 446; of Utah, 9 Stat. 453; of Washington, 10 Stat. 172. The purpose obviously, both in Porto Rico and with our own territories, was to provide a quasi guardianship during a probative period, over a developing political society, by requiring full reports (itself a sobering check) of all important performances of the local government, and by reserving power to annul any act sinister or dangerously foolish, in origin or in effect.

"The new Organic Act substantially changed the form of government by providing for an elected Senate, having, in general, the legislative powers previously exercised by the abolished Executive Council. Compare section 12. It also provided in section 38 for a Public Service Commission, and enacted:

" 'The said commission is also empowered and directed to discharge all the executive functions relating to public service corporations heretofore conferred by law upon the executive council. Franchises, rights, and privileges granted by the said commission shall not be effective until approved by the governor, and shall be reported to Congress which hereby reserves the power to annul or modify the same.' 48 U S C A Sect. 750.

"Congress thus apparently vested full control over franchises, old and new, in the Public Service Commission.

"But the Jones Act also vested in the Porto Rican Legislature (compare sections 25 and 37) general legislative authority over all matters of a legislative character not locally inapplicable or inconsistent with the provisions of the Organic Act. Under this power, the Legislature, by Act No. 70, approved December 6, 1917 (Laws of Porto Rico, vol. 2, pp. 432–546) section 60, enacted:

" 'Section 60. *Violation of existing franchises.*—Nothing in this article shall be construed to violate the provisions of any franchise that may have been granted by the Executive Council and is now in force; Provided, however, That the commission shall have the power to alter, amend, modify, or repeal such franchises, and shall exercise all the rights and powers reserved to the Executive Council by any such franchise or privilege, or by any law.'

"(3) This law was of course reported to Congress and it has not been annulled. This has some tendency to show approval by Con-

gress. *Chuoco Tiaco* v. *Forbes,* 228 U. S. 549, 558, 33 S. Ct. 585, 57 L. Ed. 960; *Fajardo Sugar Co.* v. *Holcomb* (C. C. A.) 16 F. (2d) 92, 96.

"It is thus clear, and appellants' learned counsel concedes, that the Jones Act of the Legislature of Porto Rico, or both together, vested in the Public Service Commission all powers over franchises originally vested in the Executive Council.

"The appellants' contention of no jurisdiction in that commission, therefore, rests entirely on the proposition that Congress reserved to itself alone jurisdiction to repeal or amend franchises granted by the Executive Council. It grounds this proposition on the reservation contained in section 32 of the Foraker Act, supra: 'All franchises granted in Porto Rico shall be reported to Congress, which hereby reserves the power to annul or modify the same.' Necessarily this contention also asserts the invalidity of that portion of section 60 of the Act of Porto Rico, No. 70, approved December 6, 1917, supra, which explicitly provides that the Public Service Commission shall have the power to alter, amend or repeal franchises previously granted by the Executive Council.

"We cannot adopt this construction of the general reservation by Congress of the power to annul all franchises and laws of the experimental local government set up by Congress in Porto Rico. We are constrained to hold that the purpose of Congress was, experimentally and gradually, to vest in the Porto Rican government the general powers of state governments, subject to the reserved power to annul or modify franchises and laws if and when Congress sees fit. The reservation of the power to annul franchises granted by the Executive Council is in the same general terms as the reservation of the power to annul all laws. It did not in 1901 exclude the power granted by fair necessary implication to the Executive Council to modify or repeal franchises granted by that Council. The like reservation contained in the Jones Act does no exclude or cut down the power of the Public Service Commission to repeal or alter franchises granted by it. Like the power to report statutes, the body that creates may alter or destroy the creation.

"The decree of the District Court is affirmed, with costs to the appellees in this court." *South Porto Rico Sugar Company* v. *Muñoz,* 28 F. (2d) 820–822.

In the first three errors assigned by the appellant as committed by the lower court it is claimed that the commission has no authority, power, or jurisdiction to cancel or modify

the said franchise, and these assignments are submitted without argument, inasmuch as this question has been decided by the Circuit Court of Appeals for the First Circuit, as we have already stated. We have examined the order appealed from and find that it is in accord with the law, for which reason we shall discuss some of the other grounds of the appeal.

It was not claimed either before the district court or before this court that the evidence admitted by the commission in order to enter its decree is incompetent, for which reason the controversy is limited to a determination of whether such decree is reasonable or not and whether it is in conformity to law.

In order to attack the decree of the commission and its affirmance by the court below, the appellant urges in several of its assignments of error that clause 4 of the franchise does not impose on the appellant the duty to keep the water of the lake at a certain level, and that it is simply a clause explaining that the appellant is not authorized by the franchise to carry out any affirmative acts tending to raise or to keep the level of the waters of the lake higher than the customary level of same; that this clause does not clearly state that the appellant is bound to keep the level of the water at a certain height; that the franchise does not grant to the appellant the exclusive power to use the waters of the lake, although it is true that there are no other persons taking great quantities of water therefrom, notwithstanding one or two landowners use small quantities of water, but other concessions may be made; that there is no evidence whatever to show that the appellant has carried out any act tending to close Negro pond; and that although the pond was closed and eliminated, the commission did not have the right to assume that the appellant was responsible for this situation, unless it were shown that the appellant did something to create it and that according to the franchise, it was its duty to avoid

the same. The errors assigned by the appellant hinge upon these questions.

Clause 4 of the franchise provides, as we have already seen, "that nothing herein contained shall be held or construed to authorize or permit the said company or its successors or assigns to raise or maintain the level of the waters of said lake of Guánica above the customary level thereof during the rainy season." This clause not only prohibits the grantee from exceeding said level but it also compels the same to avoid the waters of the lake from exceeding said level, for which reason this franchise necessarily gave to the grantee and its successors the management and control of Negro Pond so as to regulate and maintain said level and, consequently, the duty to perform any acts necessary to keep such level.

It appears from the facts of this case that, although there were some floods in El Anegado of Lajas prior to 1926, the same were not as extensive as the one now in question and lasted only a few months, whereas since the middle of 1926 and for over more than two years up to the time in which the commission decided this case, several thousand acres of land were still flooded, El Anegado and the lake forming a single body of water, when they are really two distinct bodies, although joined by the canal of La Angostura, through which the waters of the lake flow into El Anegado when they have a high level; all of this showing that it was the level of the lake, which was higher than the customary level of the water during the rainy season, that caused the flood. Neither the government nor the grantee or its successors have determined the level to which the franchise refers, but the natural and logical conclusion is that in view of the fact that Negro Pond is closed, the lake could not drain in the sea the excess of rain water, and this necessarily produced a level higher than the customary one during the rainy season and the continuous floods for several years of El Anegado of Lajas.

688

It is true that there is no evidence of any positive act on the part of the appellant to close Negro Pond, but if the latter was closed, as it claims, by soil carried by the Loco River, it was in any event its duty to open the same in order that the waters of the lake might not produce, as they necessarily produced when the outlet was closed, a level higher than the customary one, which caused the continuous flood of El Anegado. Consequently, we arrive at the conclusion that the order or decree of the commission is reasonable and in accord with the law, inasmuch as the appellant has failed to comply with the conditions of the franchise.

The judgment appealed from will be affirmed.

Mr. Justice Córdova Dávila took no part in the decision of this case.