Horace Havemeyer, Frank A. Dillingham, Edward S. Paine, Edwin L. Arnold, Frank M. Welty y Henry B. Orde, como socios de la sociedad Russell & Co., Sucesores, S. en C., demandantes y apelantes, v. Comisión de Servicio Público de Puerto Rico y Municipio de Lajas, demandados y apelados.

No. 5401.—*Sometido:* Marzo 30, 1932. *Resuelto:* Noviembre 9, 1933.

*O. B. Frazer* y *R. Castro Fernández* abogados de los apelantes; *Hon. Procurador General Interino*, A. *Ortiz Toro* y *M. Rodríguez Serra*, *Procurador General Auxiliar*, abogados de los apelados.

El Juez Asociado Señor Aldrey, emitió la opinión del tribunal.

La sociedad civil agrícola Russell y Co., Sucesores, S. .n C., por sus socios Horace Havemeyer y otros, como cesionaria de ciertos derechos que tenía la corporación Guánica Land Company en una franquicia, interpuso apelación en la Corte de Distrito de San Juan contra un decreto de la Comisión de Servicio Público de Puerto Rico que cancela dicha franquicia en la parte que se refiere al derecho de tomar cierta cantidad de agua de la laguna de Guánica. La corte de distrito confirmó esa resolución de la comisión y desestimó la apelación interpuesta contra ella. De esa sentencia apeló Russell y Co. para ante este Tribunal Supremo. Para la apelación ante la corte de distrito se amparó la sociedad en el artículo 78 de la Ley No. 70 de 1917 (1917 (2) pág. 433) cuyo título abreviado es "Ley de Servicio Público de Puerto Rico"; para la apelación ante nosotros en el artículo 90 de la misma ley.

Es precepto de la ley citada que la Corte de Distrito de San Juan, a la que se confiere jurisdicción exclusiva, resolverá tal clase de apelaciones con vista de las actuaciones habidas ante la Comisión: que la cuestión a decidir será si el decreto apelado es o no razonable, de acuerdo con la ley y fundado en evidencia competente; que las órdenes de la Comisión constituirán prueba prima facie de la razonabilidad de las mismas; que en el apelante recae el peso de probar lo contrario; y que si la corte declarase que la orden apelada es razonable y de acuerdo con la ley dictará decreto desestimando la apelación y confirmando la orden de la Comisión.

De los autos de la Comisión que en copia certificada fueron presentados en la corte de distrito y que están ante nosotros aparece, en resumen, lo siguiente:

El Consejo Ejecutivo de Puerto Rico concedió en el año 1901 a la corporación Guánica Land Company y a sus cesio-

narios la franquicia No. 5 por la que se la autorizó para construir un ferrocarril privado en terrenos públicos, para construir un muelle en el puerto de Guánica y para tomar veinte millones de galones diarios de agua de la laguna Guánica para riego de sus tierras y de las que tuviese arrendadas. De esa franquicia copiamos algunas de sus cláusulas, a saber:

"1. Que la Guánica Land Company (una corporación organizada y existente por virtud de las leyes del Estado de New Jersey) y sus sucesores y cesionarios, son por la presente autorizados para erigir, construir, mantener y operar una represa de concreto u otro material adecuado en el río Caño Negro, o desagüe de la leguna de Guánica, en el municipio de Yauco, y en aquellos terrenos de dueños colindantes que hayan sido adquiridos por consentimiento o mediante el debido proceso de ley, a fin de retener, acumular y conservar las aguas de la referida laguna de Guánica y de restringir y regular el fiujo del agua de dicha laguna, a través del referido caño o en otra forma, para los fines que más adelante se expondrán.

"2. Que dicha compañía y sus sucesores y cesionarios son por la presente autorizados a tomar de dicha laguna Guánica o del referido caño o desagüe la cantidad de agua que sea necesaria o suficiente (siempre que no exceda de veinte millones de galones diarios) para el adecuado riego de los terrenos que ahora o en lo sucesivo posea o arriende la referida compañía o sus sucesores o cesionarios, o cualquiera de ellos. El agua que así ha de tomarse de la referida laguna o caño puede ser de la parte o partes de los mismos adyacentes o contiguas a dichos terrenos, que la referida compañía o sus sucesores o cesionarios tengan por conveniente, y puede tomarse por gravedad a través de conductos o canales adecuados o por medio de bombas, o por cualquier otro medio aconsejable, o por cualesquiera dos o más de tales medios.

"3. Que la referida compañía y sus sucesores y cesionarios pueden erigir, construir, operar y mantener en aquellas partes de los terrenos que ahora o en lo sucesivo posean o alquilen, que estén dentro de seis metros de las márgenes del referido caño o dentro de veinte metros de la orilla de dicha laguna o de la bahía Guánica, los sistemas de bombas, canales y tuberías que sean necesarios o propios para la toma o conducción de las referidas aguas; *Diponiéndose, sin embargo,* que ningún camino público que en todo o en parte se halle dentro de los referidos límites será obstruído en forma alguna.

"4. Que nada de lo aquí contenido será interpretado en el sen-

tido de autorizar o permitir a la referida compañía o a sus sucesores o cesionarios a levantar o mantener el nivel de las aguas de dicha laguna Guánica más arriba del nivel acostumbrado de las mismas durante la época lluviosa en años ordinarios de lluvia usual y corriente; y todos los daños que se ocasionen a los dueños colindantes con motivo de la subida indebida del nivel de las aguas de dicha laguna o a causa de la baja indebida del nivel de las aguas de la misma laguna, serán pagados por la compañía, sus sucesores y cesionarios, y será sostenida toda acción de daños y perjuicios que en cualquier corte de jurisdicción competente sea entablada por los dueños colindantes contra dicha compañía, sus sucesores y cesionarios, a causa de tales daños.''

Veintisiete años después de haber sido concedida esa franquicia, en 1928, la Asamblea Municipal de Lajas tomó el acuerdo de protestar ante la Comisión de Servicio Público y ante el Comisionado del Interior de que las obras de ingeniería que se han realizado en el caño Negro de la laguna de Guánica están ocasionando daños irreparables al municipio de Lajas lanzando las aguas de la laguna de Guánica fuera del nivel más alto, invadiendo caminos municipales y haciendo imposible la vida de los vecinos y propietarios de los barrios Costa y Plata. En vista de esa queja y de cierta investigación practicada por el presidente de la Comisión, ésta ordenó que los propietarios de dicha franquicia comparecieran ante ella a demostrar por qué no debía ser cancelada la expresada franquicia. Compareció la sociedad civil agrícola Russell y Co. por sus socios Horace Havemeyer y otros como únicos dueños por traspaso de la parte de la franquicia que se refiere a la toma y uso de agua de la laguna Guánica y se opuso a que fuese cancelada o modificada, alegando también que la comisión carece de jurisdicción para cancelar o modificar dicha franquicia. También aparece que la laguna Guánica tiene un caño llamado Negro o Los Negros, de 3,900 metros o 12,792 pies de largo, que la pone en comunicación con el mar: que en 1928 ese caño estaba completamente cegado en una extensión de 300 metros contados desde la laguna, estando el resto del caño hasta el mar perfectamente visible; que el

fondo de la laguna está más alto que el nivel de las mareas altas del mar; que el valle de Lajas tiene un sitio llamado El Anegado cuyo fondo está más alto que el de la laguna, existiendo entre El Anegado y la laguna, que son dos cuerpos separados, un caño que los comunica, llamado Angostura o Carril: que El Anegado se ha inundado algunas veces antes de 1926 pero ha quedado seco pocos meses después; que desde mediados del año 1926 y durante los años 1927 y 1928 El Anegado ha estado inundado formando un solo cuerpo de agua con la laguna, estando bajo las aguas de cuatro a cinco mil cuerdas de terreno y muchas fincas particulares de gran extensión inundadas completamente algunas y otras en su mayor parte; que desde 1926 han estado bajo las aguas dos caminos municipales en una extensión de siete a ocho kilómetros; que las enfermedades han aumentado en esa región; que en las márgenes del río Loco, que desagua en la laguna cerca del caño Negro, se han hecho algunas obras para evitar que por ellas se derrame; que nunca se ha determinado por el Gobierno, por los concesionarios de la franquicia ni por sus sucesores cuál es el nivel corriente de la laguna; que estando abierto el caño Negro o Los Negros puede ser desaguado fácilmente El Anegado quedando aún agua en la laguna por la diferencia de nivel que entre ellos existe y que la concesionaria de la franquicia ha dado fincas en usufructo a alguno de los propietarios cuyas fincas han quedado inundadas, por los perjuicios que sufre.

Al ser cancelada la franquicia por la Comisión en 8 de marzo de 1929 se dispuso que el decreto comenzaría a surtir sus efectos definitivos y efectivos el 30 de junio de ese año y que en el intervalo quedaban en libertad las partes interesadas por formular cualquier solicitud nueva que estimasen pertinente para el uso de las aguas de la laguna de Guánica, sometiendo a la Comisión los datos específicos del nivel máximo de las aguas de la laguna, así como cualquier proyecto de obra a fin de que ese nivel pueda mantenerse permanentemente.

La alegación de Russell y Co. de que la comisión carece de jurisdicción para cancelar o modificar la franquicia fué suscitada por la corporación South Porto Rico Sugar Co. ante la Corte de Distrito de los Estados Unidos para Puerto Rico en la cual solicitó en un procedimiento de *injunction* que prohibiese a dicha Comisión que siguiese actuando en ese asunto, pero esa solicitud fué negada y en apelación dijo la Corte de Circuito de Boston lo siguiente:

"En mayo 28, 1928, la Comisión de Servicio Público de Puerto Rico dirigió a los apelantes una orden requiriéndoles para que comparecieran en junio 4, 1928, a mostrar causa por la que dicha Comisión no debía cancelar la franquicia concedida en marzo 19, 1901, a los predecesores en título de los apelantes por el Consejo Ejecutivo de Puerto Rico para usar diariamente 20,000,000 de galones de las aguas de la laguna de Guánica para riego, para la construcción y explotación de un ferrocarril privado que operaría en parte sobre terrenos sujetos a derechos públicos y para construir y explotar un muelle en la bahía de Guánica. Sin comparecer ante la Comisión los apelantes, el 2 de junio de 1928, radicaron una demanda en equidad solicitando un *injunction* que impidiese a la Comisión intervenir en modo alguno en el disfrute de la franquicia y ejercitar su jurisdicción sobre los apelantes en relación con dicha franquicia. La corte inferior sostuvo una moción para desestimar, radicada por el Procurador General de Puerto Rico, dicidiendo en una bien pensada y razonada opinión, que el pleito era prematuro y a la vez que la Comisión de Servicio Público tenía jurisdicción. Esta sentencia es correcta en ambos extremos.

"(1) Las cortes no tienen poder general de inspección sobre tribunales tales como las comisiones de servicio público. La intervención judicial, fuera de la expresa delegación estatutaria, debe estar fundada en la ilegal infracción de derechos de propiedad. American Coal Mining Co. v. Special Coal & Food Commission (D. C.) 268 F. 563; Sayers v. Montpelier & Wells River R. R., 90 Vt. 201, 97 A. 660, Ann. Cas. 1918 B, 1050.

"(2) Si asumimos por el momento que esta Comisión de Servicio Público carece de jurisdicción, el expedir una orden de notificación no constituye un ejercicio de autoridad o amenaza de daños irreparables que justifique la intervención restrictiva de la corte. No es de presumir que al comparecer y argumentar, la Comisión adoptaría una opinión errónea sobre la naturaleza y alcance de su jurisdicción. El

caso de los apelantes en este sentido no está respaldado en los que su ilustrada representación descansa. Philadelphia Co. v. Stimson, 223 U. S. 605, 32 S. Ct. 340, 56 L. Ed., y casos citados; Work v. Louisiana, 269 U. S. 250, 46 S. Ct. 92, 70 L. Ed. 259; Gallardo v'. Porto Rico Light & Power Co. (C.C.A.) 18 F. (2d) 918; Benedicto v. West India & Panama Tel. Co. (C.C.A.) 256 F. 417.

"La confirmación del decreto de la corte inferior (desestimando la demanda) sin duda estaría justificada por este solo motivo. Pero debemos tratar ahora, claramente en interés de las partes, más bien que en un pleito posterior, de la cuestión fundamental de la jurisdicción de la Comisión para conocer de procedimientos tendientes a revocar, alterar o modificar la franquicia de los apelantes.

"De acuerdo con la primera Carta Orgánica de Puerto Rico— Ley Foraker, de abril 12, 1900, 31 Stat. 77 (48 USCA párr. 731 *et seq.*)—el Congreso proveyó para esta recién adquirida posesión una asamblea legislativa compuesta de una Cámara Baja electiva y en lugar de un Senado, de un Consejo Ejecutivo, integrado por los seis jefes de los departamentos ejecutivos, nombrados por el Presidente. Al final de la sección 31 se decretó:

" '. . . *Disponiéndose, sin embargo,* que toda ley decretada por la Asamblea Legislativa será comunicada al Congreso de los Estados Unidos, el cual se reserva por la presente la facultad de anularla si lo tuviere por conveniente.'

"La sección 32 lee como sigue:

" 'Que la autoridad legislativa estatuída por la presente, se aplicará a todos los asuntos de carácter legislativo que no sean localmente inaplicables, incluyendo la facultad de . . . derogar cualquiera o todas las leyes y ordenanzas, de cualquiera clase, actualmente vigentes en Puerto Rico o en cualquier municipio o distrito y que no se opusieren a lo prescrito aquí. *Disponiéndose, sin embargo,* que toda concesión de franquicias, derechos y privilegios, o concesión de carácter público o cuasi público, será otorgada por el Consejo Ejecutivo, con la aprobación del Gobernador,y toda franquicia concedida en Puerto Rico será comunicada al Congreso, el cual se reserva por la presente la facultad de anularla o modificarla.'

"Franquicias y leyes, a la vez, debían ser comunicadas al Congreso, el cual se reservó la autoridad de anularlas.

"Según la Resolución Conjunta de mayo 1, 1901, enmendando la Ley Foraker de abril 12, 1900, se proveyó:

" 'Que todas las franquicias, privilegios o concesiones otorgadas bajo la sección 32 de dicha ley, proveerán que los mismos estarán sujetos a enmienda, alteración o revocación.'

"Esta fué la disposición corriente que se siguió para hacer frente a la doctrina del caso de Dartmouth College. De acuerdo con esas facultades, el Consejo Ejecutivo al siguiente año (1901) otorgó la franquicia en cuestión, proveyendo en el artículo XVIII: 'que las franquicias, privilegios y concesiones por la presente otorgados, quedarán sujetos a enmienda, alteración o revocación.'

"El mismo poder general de anular leyes decretadas por la Legislatura de Puerto Rico ha sido mantenido en la sección 34 de la segunda Carta Orgánica—Ley Jones, de marzo 2, 1917. Al así reservarse en ambas leyes orgánicas la autoridad para anular leyes decretadas y franquicias otorgadas por el Gobierno de Puerto Rico, el Congreso procedió en íntima analogía con su larga práctica relativa a los territorios situados dentro de los límites de los presentes Estados Unidos—estados en perspectiva. Compárense la carta orgánica de Oregon, 9 Stat. 323, párr. 6; de Minnesota, 9 Stat. 403; de New Mexico, 9 Stat. 446; de Utah, 9 Stat. 453; de Washington, 10 Stat. 172. El propósito, tanto en Puerto Rico como en nuestros propios territorios, claramente fué establecer una cuasi tutela durante un período probatorio, sobre una sociedad política en formación, mediante el requerimiento de amplios informes (de por sí un saludable freno) de todas las importantes actuaciones del gobierno local, y mediante la reserva de la autoridad para anular cualquier acto siniestro o peligrosamente insensato, en su origen o en sus efectos.

"La nueva carta orgánica modificó sustancialmente la forma de gobierno, proveyendo un Senado electivo, con las facultades legislativas en general antes ejercitadas por el extinto Consejo Ejecutivo. Compárese la sección 12. También estableció por la sección 38 una Comisión de Servicio Público y dispuso:

" '. . . Dicha Comisión queda también autorizada, y así se le ordena, para desempeñar todas las funciones ejecutivas, referentes a corporaciones de servicio público, hasta ahora conferidas por ley al Consejo Ejecutivo. Las franquicias, derechos y privilegios concedidos por la mencionada comisión no entrarán en vigor hasta que sean aprobados por el Gobernador, y deberán ser comunicados al Congreso, el cual se reserva por la presente la facultad de anularlos o modificarlos.' 48 USCA parr. 750.

"El Congreso, pues, aparentemente confirió completos poderes sobre las franquicias, viejas y nuevas, a la Comisión de Servicio Público.

"Pero la Ley Jones también confirió a la Legislatura de Puerto Rico (compárense las secciones 25 y 37) facultad legislativa general sobre todos los asuntos de carácter legislativo que no sean localmente

inaplicables o incompatibles con las disposiciones de la carta orgánica. Bajo esta facultad, la Legislatura, por la Ley No. 70, aprobada el 6 de diciembre de 1917, dispuso (Leyes de Puerto Rico, tomo 2, págs. 432 a 546), artículo 60:

" 'Artículo 60.—*Infracción de franquicias vigentes.*—Nada de lo contenido en este capítulo se interpretará en el sentido de infringir las disposiciones de cualquier franquicia que pueda haberse otorgado por el Consejo Ejecutivo y estuviese actualmente vigente. La Comisión tendrá facultad para alterar, enmendar, modificar o derogar tales franquicias y ejercerá todos los derechos y facultades reservados al Consejo Ejecutivo, por cualesquiera de dichas franquicias o privilegios o por cualquiera ley.'

" (3) Esta ley fue, por supuesto, comunicada al Congreso y no ha sido anulada. Ello indica alguna tendencia demostrativa de la aprobación del Congreso. Chuoco Tiaco v. Forbes, 228 U. S. 549, 558, 33 S. Ct. 585, 57, L. Ed. 960; Fajardo Sugar Co. v. Holcomb (C.C.A.) 16 F. (2d) 92, 96.

"Es claro, pues, y así lo admite la ilustrada representación de los apelantes, que la Ley Jones, o la Legislatura de Puerto Rico, o ambas invistieron a la Comisión de Servicio Público de todos los poderes que sobre las franquicias tenía originalmente el Consejo Ejecutivo.

" (4) La contención de los apelantes de falta de jurisdicción en la Comisión descansa, pues, enteramente en la proposición de que el Congreso se reservó exclusiva jurisdicción para revocar o enmendar las franquicias concedidas por el Consejo Ejecutivo. Fundamentan esta proposición en la reserva contenida en la sección 32 de la Ley Foraker, supra: 'y toda franquicia concedida en Puerto Rico será comunicada al Congreso, el cual se reserva por la presente la facultad de anularla o modificarla.' Esta contención necesariamente afirma también la validez de aquella parte de la sección 60 de la ley de Puerto Rico No. 70, aprobada el 6 de diciembre de 1917, supra, que explícitamente dispone que la Comisión de Servicio Público tendrá el poder de alterar, enmendar o revocar franquicias previamente otorgadas por el Consejo Ejecutivo.

"No podemos nosotros adoptar tal interpretación de la reserva general hecha por el Congreso de la facultad de anular todas las franquicias y leyes del gobierno local experimental que el Congreso instituyera en Puerto Rico. Nos vemos constreñidos a sostener que el propósito del Congreso fué investir experimental y gradualmente al Gobierno de Puerto Rico con los poderes generales de los gobiernos de los estados, sujeto a la facultad reservada de anular o modificar franquicias y leyes cuando el Congreso así lo dispusiere. La reserva

de facultades para anular franquicias concedidas por el Consejo Ejecutivo es en los mismos términos generales que la reserva del poder de anular todas las leyes. En 1901 no se excluyó el poder otorgado mediante razonable y necesaria implicación al Consejo Ejecutivo para modificar o revocar las franquicias otorgadas por aquel consejo. La misma reserva contenida en la Ley Jones no excluye ni restringe el poder de la Comisión de Servicio Público para revocar o alterar las franquicias que conceda. Al igual que el poder de revocar estatutos, el cuerpo que crea puede alterar o destruir la cosa creada.

"El decreto de la corte de distrito es confirmado concediéndose las costas ante esta corte a los apelados."

■ Los tres primeros motivos de error alegados por la apelante como cometidos por la corte inferior se refieren a que la Comisión no tiene facultad, poder o jurisdicción para cancelar la franquicia mencionada ni para modificarla, y se limita a enunciarlos sin argumentarlos por haber sido resuelta esa cuestión por la Corte de Circuito de Boston, como hemos consignado antes. Hemos examinado esa resolución y encontramos que está de acuerdo con la ley por lo que pasaremos a otros motivos de la apelación.

■ Ni en la corte de distrito ni ante nosotros se ha hecho alegación alguna de que la prueba admitida por la comisión para su decreto no sea competente, por lo que la controversia queda reducida a determinar si tal decreto es razonable o no y si está de acuerdo con la ley.

■ Para atacar la orden de la Comisión y su confirmación por la corte inferior alega la apelante en varios de los motivos de su apelación que la cláusula 4 de la franquicia no impone el deber a la apelante de mantener el nivel de las aguas de la laguna, sino que es simplemente una cláusula aclarando que la apelante no está autorizada por la franquicia para hacer actos afirmativos algunos para elevar o mantener el nivel de las aguas de la laguna más alto que el ordinario de la misma; que esa cláusula no dice claramente que la apelante tendrá el deber de mantener el nivel de las aguas a cierta altura; que en la franquicia no se concede a la apelante el poder exclusivo de tomar agua de la laguna, aunque es cierto

que no hay otras personas tomando grandes cantidades de agua de la laguna pues uno o dos terratenientes toman agua en pequeñas cantidades, pero pueden hacerse otras concesiones; que no existe prueba alguna de que los apelantes han hecho acto alguno para cegar el caño Negro; y que aunque ese caño quedó cegado y eliminado, la Comisión no tenía el derecho de presumir que la apelante es responsable de esa condición sin que se demuestre que la apelante hizo algo para causar dicha condición y sin que la franquicia la obligue a evitarlo. Sobre esas cuestiones giran los motivos de error alegados por la apelante.

La cláusula 4ª. de la franquicia dice, según hemos visto, que nada de lo contenido en ella se entenderá que autoriza o permite a la Guánica Land Company o a sus cesionarios a levantar o mantener el nivel de las aguas de la laguna sobre el nivel ordinario de ella durante la época de las lluvias; cláusula que no sólo prohibe a la concesionaria el levantar dicho nivel sino que también la obliga a no permitir que las aguas de la laguna pasen el referido nivel, por lo que esa franquicia dió necesariamente a la concesionaria y a sus sucesores el gobierno y manejo del caño Negro para poder regular y mantener el expresado nivel, y consiguientemente la obligación de hacer lo necesario para mantener tal nivel. De los hechos en este caso aparece que si bien hubo algunas inundaciones en El Anegado de Lajas antes de 1926 no fueron de la extensión que la que nos ocupa y fueron de pocos meses de duración, mientras que desde mediados del año 1926 y por dos años más y hasta que la comisión resolvió este asunto continuaban inundados algunos miles de cuerdas de terreno, formando el Anegado y la laguna una sola extensión de agua cuando son realmente dos cuerpos separados aunque unidos por el canal de la Angostura por el cual las aguas de la laguna derraman en el Anegado cuando tienen un nivel alto, todo lo que demuestra que fué el nivel de la laguna, más alto que el de épocas ordinarias de lluvia, el causante de tal inundación. No se ha fijado por el gobierno ni por la concesionaria y sus

sucesores cuál es la altura del nivel a que se refiere la franquicia, pero la conclusión natural y lógica es que por estar cegado el caño Negro no pudo la laguna desaguar en el mar el exceso de las lluvias, lo que tuvo que producir necesariamente un nivel más alto que el corriente en épocas de lluvia y la inundación continuada por años del Anegado de Lajas. Es cierto que no existe prueba de acto alguno positivo de la apelante para cegar el caño Negro, pero si éste quedó cegado, como ella dice, por tierras arrastradas por el río Loco, tenía de todos modos el deber de abrirlo para que no se produjese en la laguna, como necesariamente se produjo al quedar cerrado ese desagüe, un nivel más alto que el ordinario, que produjo la inundación continuada del Anegado. En consecuencia, llegamos a la conclusión de que la orden o decreto de la comisión es razonable y de acuerdo con la ley por haber dejado la apelante de cumplir las condiciones de la franquicia.

*La sentencia apelada debe ser confirmada.*

El Juez Asociado Señor Córdova Dávila no intervino.